1  David E. Bower (SBN 119546)
2  **MONTEVERDE & ASSOCIATES PC**
   600 Corporate Pointe, Suite 1170
3  Culver City, CA 90230
   Tel: (213) 446-6652
4  Fax: (212) 202-7880

5  *Counsel for Plaintiff*

6

7              **UNITED STATES DISTRICT COURT**

8              **NORTHERN DISTRICT OF CALIFORNIA**

9

10  SAISRAVAN BHARADWAJ KARRI,
    Individually and on Behalf of All Others       Civil Action No. _____
11  Similarly Situated,

12                    Plaintiff,              **CLASS ACTION COMPLAINT**

13         v.                                 **DEMAND FOR JURY TRIAL**

14  OCLARO, INC., MARISSA PETERSON,            **VIOLATIONS OF THE SECURITIES**
    EDWARD COLLINS, GREG                       **EXCHANGE ACT OF 1934**
15  DOUGHERTY, KENDALL COWAN,
    DENISE HAYLOR, IAN SMALL, BILL
16  SMITH, and JOEL A. SMITH III,

17                    Defendant.

18

19        Plaintiff SaiSravan Bharadwaj Karri ("Plaintiff"), by and through his undersigned

20  attorneys, brings this stockholder class action on behalf of himself and all other similarly situated

21  public stockholders of Oclaro, Inc. ("Oclaro" or the "Company") against Oclaro and the members

22  of the Company's board of directors (the "Board" or the "Individual Defendants," and, together

23  with Oclaro, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities

24  Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and United

25  States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in

26  connection with the acquisition of Oclaro by Lumentum Holdings Inc. ("Lumentum") through a

27  transaction as alleged in detail herein.

28

                                      1

## NATURE OF THE ACTION

1.      On March 11, 2018, Oclaro, Lumentum, Prota Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Lumentum ("Merger Sub"), and Prota Merger, LLC, a Delaware limited liability company and a wholly owned subsidiary of Lumentum ("Merger Sub LLC"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Lumentum will acquire Oclaro in a two-step merger transaction.  First, Merger Sub will merge with and into Oclaro (the "First Step Merger") with Oclaro surviving the First Step Merger.  As soon as reasonably practicable following the First Step Merger, Oclaro will merge with and into Merger Sub LLC with Merger Sub LLC continuing as the surviving entity (the "Second Step Merger," and taken together with the First Step Merger, the "Proposed Transaction").

2.      Pursuant to the terms of the Merger Agreement, each outstanding share of Oclaro will be converted into the right to receive $5.60 in cash and 0.0636 shares of Lumentum common stock (the "Merger Consideration").  Based on the closing price of Lumentum's stock on March 9, 2018 of $68.98 (the last trading day before the Oclaro and Lumentum announced the execution of the Merger Agreement), the per share value of Oclaro common stock implied by the Merger Consideration was $9.99, or approximately $1.8 billion in value.  However, based on the closing stock price of Lumentum common stock on May 29, 2018 (the most recent practicable date prior to the date of the Proxy), the per share value of Oclaro common stock implied by the Merger Consideration was $9.60.

3.      On June 1, 2018, in order to convince Oclaro's public common stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Oclaro and Lumentum; (ii) the valuation analyses conducted by the Company's financial advisor, Jefferies LLC ("Jefferies"); and (iii) the background process leading up to the Proposed Transaction.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

5. The special meeting of Oclaro stockholders to vote on the Proposed Transaction is scheduled for July 10, 2018 (the "Stockholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the Stockholder Vote on the Proposed Transaction so that they can properly exercise their corporate suffrage rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the Stockholder Vote and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Oclaro's public common stockholders sufficiently in advance of the Stockholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8. This Court has jurisdiction over the Defendants because each Defendant is either a corporation that is incorporated in, conducts business in, and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists. Oclaro is incorporated in this Delaware and is headquartered in this District. Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

**PARTIES**

10.     Plaintiff is, and has been at all times relevant hereto, a common stockholder of Oclaro.

11.     Defendant Oclaro is a Delaware corporation and maintains its principal executive offices at 225 Charcot Avenue, San Jose, California 95131.  The Company is a leader in optical components, modules, and subsystems for optical transport and metro networks, enterprise networks, and data centers.  Oclaro's common stock is listed on the NASDAQ under the ticker symbol "OCLR".

12.     Defendant Marissa Peterson ("Peterson") is, and has been at all relevant times, a director of Oclaro, and currently serves as Chairman of the Board.

13.     Defendant Edward Collins ("Collins") is, and has been at all relevant times, a director of Oclaro.

14.     Defendant Greg Dougherty ("Dougherty") is, and has been at all relevant times, a director of Oclaro and currently serves as the Chief Executive Officer ("CEO") of the Company.

15.     Defendant Kendall Cowan ("Cowan") is, and has been at all relevant times, a director of Oclaro.

16.     Defendant Denise Haylor ("Haylor") is, and has been at all relevant times, a director of Oclaro.

17.     Defendant Ian Small ("Small") is, and has been at all relevant times, a director of Oclaro.

18.     Defendant Bill Smith ("Smith") is, and has been at all relevant times, a director of Oclaro.

19.     Defendant Joel A. Smith III ("J. Smith") is, and has been at all relevant times, a director of Oclaro

20.     The defendants identified in paragraphs 12 through 19 are collectively referred to herein as the "Individual Defendants" and/or the "Board," collectively with Oclaro the "Defendants."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**CLASS ACTION ALLEGATIONS**

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Oclaro (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of May 4, 2018, there were approximately 170 million shares of Oclaro common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Oclaro will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

     i.     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act;

     ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

     iii.     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

(e)   the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)   a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Company Background and the Proposed Transaction

23.   Oclaro is one of the leading providers of optical components and modules for the long-haul, metro and data center markets.  Leveraging more than three decades of laser technology innovation and photonics integration, Oclaro provides differentiated solutions for optical networks and high-speed interconnects driving the next wave of streaming video, cloud computing, application virtualization and other bandwidth-intensive and high-speed applications.

24.   On March 12, 2018, Oclaro and Lumentum issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

### LUMENTUM TO ACQUIRE OCLARO FOR $1.8B IN CASH AND STOCK

- *Best in class photonics capabilities join forces to accelerate innovation and industry roadmaps*

- *Strengthens and broadens R&D capabilities and product portfolio*

- *Estimate more than $60 million in annual run-rate synergies within 12 to 24 months*

- *Expected to be accretive to non-GAAP earnings per share immediately after closing*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**Milpitas, Calif., and San Jose, Calif., March 12, 2018** – Lumentum Holdings Inc. ("Lumentum" or the "Company") a leading provider of photonics products for optical networking and lasers for industrial and consumer markets, and Oclaro, Inc. ("Oclaro") a leader in optical components and modules for the long-haul, metro, and data center markets, today announced that the two companies have signed a definitive agreement, unanimously approved by the boards of directors of both companies, pursuant to which Lumentum will acquire all of the outstanding common stock of Oclaro. For each share of Oclaro stock held, Oclaro stockholders will be entitled to receive $5.60 in cash and 0.0636 of a share of Lumentum common stock, subject to the terms of the definitive agreement. The transaction values Oclaro at $9.99 per share or approximately $1.8 billion in equity value, based on the closing price of Lumentum's stock on March 9, 2018, of $68.98. The transaction value represents a premium of 27% to Oclaro's closing price on March 9, 2018 and a premium of 40% to Oclaro's 30 day average closing price. Oclaro stockholders are expected to own approximately 16% of the combined company at closing.

"Joining forces with Oclaro strengthens our product portfolio, broadens our revenue mix, and positions us strongly for the future needs of our customers. Oclaro brings its leading Indium Phosphide laser and Photonic Integrated Circuit and coherent component and module capabilities to Lumentum. The combined company will drive innovation faster and accelerate the development of products to enable our customers to win," said Alan Lowe, Lumentum's President and CEO. "We are delighted to welcome the talented Oclaro team to Lumentum and look forward to a swift completion of the transaction with a focus on supporting our customers and delivering shareholder value."

"I am very pleased that two of the optical industry leaders, Oclaro and Lumentum, will join forces. Together, we will be an even stronger player in fiber optic components and modules for high-speed communications and a market leader in 3D sensing. This is a fantastic combination for all of our stakeholders, including stockholders, employees, customers and partners," said Greg Dougherty, Oclaro's CEO. "I am extremely proud of what the Oclaro team has accomplished over the last five years. We have enjoyed tremendous success and this combination will create even more exciting opportunities for the team."

The transaction is expected to generate more than $60 million of annual run-rate synergies within 12 to 24 months of the closing and be immediately accretive to non-GAAP earnings per share.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Lumentum intends to fund the cash consideration with a combination of cash on hand from the combined companies' balance sheets and $550 million in debt financing.  The transaction is expected to close in the second half of calendar 2018, subject to approval by Oclaro's stockholders, antitrust regulatory approval in the U.S. and China, and other customary closing conditions.

**Board of Directors**

One member of Oclaro's Board of Directors, as mutually determined, will join Lumentum's Board of Directors upon the closing of the transaction.

**Advisors**

Deutsche Bank Securities served as the exclusive financial advisor to Lumentum and Wilson Sonsini Goodrich & Rosati served as legal advisor.  Jefferies LLC served as exclusive financial advisor to Oclaro and Jones Day served as legal advisor.[1]

25.     The Merger Consideration offered to Oclaro stockholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the Merger Consideration being offered for those securities in the Proposed Transaction given the Company's prospects for future growth and earnings.

26.     Accordingly, it is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's stockholders can properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote in favor of the Proposed Transaction.

**II.     The Proxy is Materially Incomplete and Misleading**

27.     On June 1, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Oclaro's stockholders.  The Proxy solicits the Company's stockholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's

---

[1]     Oclaro, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Joint Press Release of Lumentum Holdings Inc. and Oclaro, Inc.) (March 12, 2018).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting decision in connection with the Proposed Transaction.

### *Material Omissions Concerning Oclaro's Financial Projections*

28.     First, the Proxy provides three sets of Oclaro financial projections—the December, January, and February Projections—which were each prepared by Oclaro's management.  *See* Proxy at 104-107.  However, the Projections each provide several non-GAAP financial metrics, including Non-GAAP Operating Income, Adjusted EBITDA, Free Cash Flow, Adjusted EPS, and Unlevered Free Cash,[2] but fails to disclose the line-item projections for the specific metrics, adjustments, and/or inputs that are used to calculate these Non-GAAP financial measures or provide a reconciliation of the Non-GAAP measures to their most directly comparable GAAP financial measure, such as Net Income.  Proxy at 104-107.

29.     For example, the Proxy defines Non-GAAP Operating Income as "Gross Margin (as shown in the table above) and deducting total operating expense," but fails to disclose Oclaro's projected total operating expense.

30.     Likewise, the Proxy defines Adjusted EBITDA as "non-GAAP Operating Income (as shown in the table above) and adding back share based compensation, fixed asset disposal and restructuring / M&A charges," but fails to disclose Oclaro's projected: (i) share based compensation; (ii) fixed asset disposal; and (iii) restructuring / M&A charges.

31.     Similarly, the Proxy defines Free Cash Flow as "non-GAAP Adjusted EBITDA (as shown in the table above) and deducting capital expenditures," but fails to disclose Oclaro's projected capital expenditures.

---

[2]     Unlevered free cash flows are used to determine a company's enterprise value.  The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure.  This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall.  For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

32.     Additionally, the Proxy defines Adjusted EPS as "Non-GAAP Operating Income (as shown in the table above) and adding interest income, interest expense and the provision of tax, then dividing that sum by the forecasted diluted share count," but fails to disclose Oclaro's projected: (i) interest income; (ii) interest expense, (iii) tax; and (iv) diluted share count.

33.     Moreover, the Proxy defines Unlevered Free Cash Flow as "net operating profit after taxes, adding depreciation and amortization, and subtracting capital expenditures and changes in net working capital," but fails to disclose Oclaro's projected: (i) net operating profit after taxes; (ii) depreciation and amortization; (iii) capital expenditures; and (iv) net working capital.

34.     The failure to disclose the line-item projections that compose Oclaro's Non-GAAP Operating Income, Adjusted EBITDA, Free Cash Flow, Adjusted EPS, and Unlevered Free Cash renders the Proxy materially incomplete and misleading because non-GAAP numbers are inherently misleading.  Contrary to GAAP metrics, non-GAAP figures are not standardized and, consequently, can be manipulated and easily taken out of context.

35.     In fact, the Proxy acknowledges that non-GAAP financial metrics are inherently misleading: "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Oclaro may not be comparable to similarly titled amounts used by other companies." *See* Proxy at 107.

36.     Because non-GAAP measures, such as Adjusted EBITDA, can be measured in different ways, it is inherently misleading when it is not taken in context with GAAP figures, such as Net Income or Operating Income, or reconciled alongside its line-items inputs.

***Material Omissions Concerning Lumentum's Financial Projections***

37.     Second, the Proxy states that Jefferies "reviewed certain information furnished to us by Lumentum's management, including financial forecasts and analyses, relating to the business, operations and prospects of Lumentum (the "Lumentum Forecasts")," but wholly fails to disclose the Lumentum Forecasts.  *See* Proxy at 97.

38.     The failure to provide Oclaro stockholders with the Lumentum Forecasts is particularly material in light of the fact that the Board has asked Oclaro stockholders to approve

the Proposed Transaction, pursuant to which the Merger Consideration will be composed of stock in another company: Lumentum. Accordingly, the Lumentum Forecasts must be provided to Oclaro stockholders for them to be able to evaluate the future prospects of Lumentum and in order to assess the fairness of the Merger Consideration.

39.     The omissions from the above-referenced projections renders the financial projections included on pages 104 through 108 of the Proxy materially incomplete and misleading. If a recommendation statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

40.     As a result, Defendants must provide Oclaro stockholders with a reconciliation table of Oclaro's projected non-GAAP financial metrics to their most comparable GAAP measure or the line items used to calculate the non-GAAP financial measures and the Lumentum Forecasts in order to make the Proxy not materially incomplete and misleading.

### Material Omissions Concerning Jefferies' Financial Analyses

41.     The Proxy describes Jefferies' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Jefferies' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Oclaro's stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Jefferies' fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Oclaro's common stockholders.

42.     With respect to Jefferies' *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the inputs and assumptions underlying the discount rates ranging from 11.0% to 13.0%; (ii) the inputs and assumptions underlying the terminal value range of 4.0% to 6.0%; (iii)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

Oclaro's projected cash and cash equivalents as of June 30, 2018; and (iv) Oclaro's projected total debt as of June 30, 2018. *See* Proxy at 100.

43. These key inputs are material to Oclaro common stockholders, and their omission renders the summary of Jefferies' *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

44. With respect to Jefferies' *Selected Publicly Traded Companies Analysis*, the Proxy fails to disclose the individual multiples for the companies observed by Jefferies' in the analysis. *See* Proxy at 100-101. The omission of these multiples renders the summary of the analysis and the multiples and implied equity reference ranges calculated for Oclaro misleading. A fair summary of Jefferies' *Selected Publicly Traded Companies Analysis* requires the disclosure of the individual multiples for each company; merely providing the high, low, and median multiples that a banker applied is insufficient, as Oclaro's stockholders unable to assess whether the banker

applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the Company's value.

45.     Similarly, with respect to the Jefferies' *Selected Transactions Analysis*, the Proxy fails to disclose the individual multiples for the transactions Jefferies evaluated.  *See* Proxy at 101-102.  For the same reasons mentioned above, the omission of these multiples renders the summary of the analysis and the multiples and implied equity reference ranges calculated misleading.  In addition, like Jefferies' *Discounted Cash Flow Analysis*, the *Selected Transactions Analysis* also fails to disclose Oclaro's projected cash and cash equivalents and projected total debt as of June 30, 2018, despite the fact that these metrics were provided by Oclaro's management.  Accordingly, a fair summary of Jefferies' *Selected Transactions Analysis* requires disclosure of the individual multiples and the additional financial metrics that were considered in the *Selected Transactions Analysis*.

46.     Likewise, with respect to Jefferies' *Lumentum* analysis, the Proxy fails to disclose the individual multiples for the transactions Jefferies evaluated.  *See* Proxy at 103.  For the same reasons mentioned above, the omission of these multiples renders the summary of the analysis and the multiples calculated materially misleading.  In fact, the individual multiples are particularly important in light of the fact that the Merger Consideration is composed of stock in another company: Lumentum.

47.     In addition to the individual multiples, the Proxy also fails to disclose the identities of the research analysts that Jefferies considered in connection with its *Lumentum* analysis.  *See* Proxy at 104.  The absence of such information forces Company stockholders to blindly rely on the research analyst referenced simply because Jefferies found them satisfactory.  Accordingly, the misleading information should be addressed by providing the identities and price targets of research analysts.

48.     With respect to Jefferies' *Oclaro* analysis, which appears to be a premia paid analysis, the Proxy fails to disclose the individual premiums from the different mergers and acquisitions transactions that Jefferies' observed.  *See* Proxy at 101-102.  Instead, like Jefferies' *Lumentum* analysis, Oclaro's stockholders are forced to blindly accept on the credibility of the

analysis simply because Jefferies found the unknown transactions satisfactory.  Omission of the identities of the transactions observed and their respective premiums renders the summary of the analysis, the 25th and 75th Percentile one-day and one-month premiums, and the range of the implied present value per share of Oclaro common stock misleading.  A fair summary of Jefferies' *Oclaro* analysis requires the disclosure of the identities of the transactions observed and their respective premiums; merely providing the number of transactions and the 25th and 75th Percentile one-day and one-month premiums paid that a banker applied is insufficient, as Oclaro's stockholders unable to assess whether the banker considered the appropriate transactions, or, instead, only considered certain transactions that resulted in unreasonably low premiums paid in order to drive down the Company's value and make the Merger Consideration appear more favorable.

### Material Omissions Concerning the Background Process of the Proposed Transaction

49.     The Proxy also omits material information concerning the sales process leading up to the Proposed Transaction.

50.     The Proxy states that Oclaro entered into nondisclosure agreements with Company D and Company F.  *See* Proxy at 81-82.  In contrast to the nondisclosure agreement that Oclaro entered into with Company A, *see* Proxy at 87, the Proxy fails to disclose whether the nondisclosure agreements with Company A and Company F contained standstill provisions and, if so, whether such standstill provision contained a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect.  The failure to disclose the existence of DADW provisions creates the false impression that an interested party who signed a nondisclosure agreement could have made a superior proposal.  But that is not true.  If those nondisclosure agreements contained DADW provisions, Company D and Company F could only make a superior proposal by breaching their respective agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly.  Thus, the omission of this information renders the references to the nondisclosure agreements in the Proxy materially incomplete and therefore misleading as any reasonable shareholder would deem the fact that the most likely potential topping bidders in

the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

51.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Stockholder Vote, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

54.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

55.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

56.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Oclaro and Lumentum; (ii) the valuation analyses conducted by the Company's financial advisor, Jefferies; and (iii) the background process leading up to the Proposed Transaction.

57.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to common stockholders although they could have done so without extraordinary effort.

58.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Jefferies reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Jefferies, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Jefferies' analyses in connection with their receipt of the fairness opinions, question Jefferies as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review

it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

59.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

60.     Oclaro is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Oclaro within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Oclaro, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

1    indirectly, the decision making of the Company, including the content and dissemination of the

2    various statements that Plaintiff contends are materially incomplete and misleading.

3        64.    Each of the Individual Defendants was provided with or had unlimited access to

4    copies of the Proxy by Plaintiff to be misleading prior to the date the Proxy was issued, and had

5    the ability to prevent the issuance of the false and misleading statements or cause the statements

6    to be corrected.

7        65.    In particular, each of the Individual Defendants had direct and supervisory

8    involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

9    the power to control or influence the particular transactions giving rise to the Exchange Act

10   violations alleged herein, and exercised the same.   The Proxy contains the unanimous

11   recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

12   were thus directly involved in preparing this document.

13       66.    In addition, as the Proxy sets forth, and as described herein, the Individual

14   Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

15   Proxy purports to describe the various issues and information that the Individual Defendants

16   reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

17   input on the content of those descriptions.

18       67.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

19   of the Exchange Act.

20       68.    As set forth above, the Individual Defendants had the ability to exercise control

21   over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

22   their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these

23   Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

24   result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

25       69.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise

26   of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

27   and irreparable injury that Defendants' actions threaten to inflict.

28                              **PRAYER FOR RELIEF**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

   A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

   B.  Enjoining Defendants and all persons acting in concert with them from proceeding with the Stockholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

   C.  Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

   D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

   E.  Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

   Plaintiff demands a trial by jury on all issues so triable.

DATED: June 9, 2018

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
    mschreiner@monteverdelaw.com

*Counsel for Plaintiff*

Respectfully submitted,
*/s/ David E. Bower*
 David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
Fax: (212) 202-7880
Email:  dbower@monteverdelaw.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934