1   David E. Bower (SBN 119546)
2   **MONTEVERDE & ASSOCIATES PC**
    600 Corporate Pointe, Suite 1170
3   Culver City, CA 90230
    Tel.: (213) 446-6652
4   Fax: (212) 202-7880

5   *Counsel for Lead Plaintiff*

6

7                    **UNITED STATES DISTRICT COURT**

8                    **NORTHERN DISTRICT OF CALIFORNIA**

9

10  SAISRAVAN BHARADWAJ KARRI,
    Individually and on Behalf of All Others          Civil Action No. 3:18-cv-03435-JD
11  Similarly Situated,

12              Plaintiff,                             **AMENDED CLASS ACTION
                                                       COMPLAINT**
13      v.
                                                       **DEMAND FOR JURY TRIAL**
14  OCLARO, INC., MARISSA PETERSON,
    EDWARD COLLINS, GREG                               **VIOLATIONS OF THE SECURITIES
15  DOUGHERTY, KENDALL COWAN,                          EXCHANGE ACT OF 1934**
    DENISE HAYLOR, IAN SMALL, BILL
16  SMITH, JOEL A. SMITH III,
    LUMENTUM HOLDINGS INC., and
17  PROTA MERGER, LLC,

18              Defendant.

19

20          Lead Plaintiff SaiSravan Bharadwaj Karri ("Plaintiff"), by and through his undersigned

21  attorneys, alleges upon personal knowledge with respect to himself, and upon information and

22  belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as

23  follows:

24                              **NATURE OF THE ACTION**

25          1.      This action is brought as a class action by Plaintiff on behalf of himself and the

26  other former public stockholders of Oclaro, Inc. ("Oclaro" or the "Company") against Oclaro and

27  the members of the Company's board of directors (the "Board" or the "Individual Defendants")

28

for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"), in connection with the acquisition of Oclaro by Lumentum Holdings Inc. ("Lumentum") (the "Merger").

2.     On March 11, 2018, Oclaro, Lumentum, Prota Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Lumentum ("Merger Sub"), and Prota Merger, LLC, a Delaware limited liability company and a wholly owned subsidiary of Lumentum ("Merger Sub LLC"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Lumentum would acquire Oclaro in a two-step merger transaction.[1]

3.     On June 1, 2018, in order to convince Oclaro's stockholders to vote in favor of the unfair Merger, Defendants authorized the filing of a materially false and/or misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

4.     Specifically, the Proxy contained the following materially false and/or misleading statements:

i.     that the significantly lower, downward adjusted projections prepared by Oclaro management in January 2018 (the "January Projections") and February 2018 (the "February Projections") "were prepared on a *reasonable basis*, reflecting the best currently available estimates and judgments at the time of their preparation," Proxy at 105, and reflected the "*good faith judgments* of the management of Oclaro as to the *future financial performance of Oclaro*," Proxy at 97. These statements were false or misleading statements of opinion because, as set forth below, Defendants did not and could not have legitimately believed that the significantly downward adjusted projections were in fact reasonable or prepared in good

---

[1]   First, Merger Sub would merge with and into Oclaro (the "First Step Merger") with Oclaro surviving the First Step Merger. As soon as reasonably practicable following the First Step Merger, Oclaro would merge with and into Merger Sub LLC with Merger Sub LLC continuing as the surviving entity.

faith—rather, Defendants knew they were created to obtain a fairness opinion and justify the otherwise unjustifiable Merger Consideration;

ii.     the January Projections and February Projections, which were materially misleading representations of Oclaro's stand-alone future financial performance, which Defendants knew based on the Company's financial performance and Oclaro management's contemporaneous statements made around the time these much lower projections were prepared; and

iii.    the implied equity reference ranges per share for Oclaro that were calculated by Oclaro's financial advisor, Jefferies LLC ("Jefferies"), and derived from the significantly lower February Projections, which were misleading representations of the Company's value because they were based on the unreasonably downward revised February Projections that the Defendants knew presented an inaccurate picture of Oclaro's future performance.

5.     In addition to these three materially misleading statements, the Proxy failed to disclose the financial forecasts relating to the business, operations and prospects of Lumentum (the "Lumentum Forecasts") prepared by Lumentum management and provided to the Board and Jefferies to use in connection with the preparation of its fairness opinion. This was a material omission given that (a) part of the Merger Consideration was in the form of Lumentum stock; (b) the Proxy touted "Lumentum's future prospects and opportunities for long-term growth" as a reason why Oclaro stockholders should support the Merger, Proxy at 94; and (c) Jefferies prepared a valuation analysis and summary thereof concerning Lumentum in support of its fairness opinion. Indeed, even the Board considered the such information a "material" factor. Proxy at 96. Consequently, the omission of the Lumentum Forecasts from the Proxy rendered these statements discussing or referring to Lumentum's value and prospects misleadingly incomplete half-truth statements. By touting the benefit of Lumentum's future prospects and opportunities for long-term growth, including the opportunities that the combined company would benefit from, and the valuation analysis for Lumentum, the Defendants were obligated to present a material complete and non-misleading picture of Lumentum.

3

6.     As set forth below, Defendants and Oclaro management knew that the January Projections and February Projections did not reflect "good faith" downward adjustments to the financial projections that management prepared in December 2017 (the "December Projections," and together with the January Projections and February Projections, the "Oclaro Projections"), as illustrated by the complete absence of any explanation for the substantial reduction in the compound annual growth rates ("CAGR") for Oclaro's expected revenue, Adjusted EBITDA, non-GAAP net income, and Adjusted EPS, and further refuted by statements made by certain key Oclaro executives during the time period before, during, and after the Oclaro Projections were prepared.

7.     The special meeting of Oclaro stockholders to vote on the Merger was held on July 10, 2018 (the "Stockholder Vote").  A majority of Oclaro stockholders voted to approve the Merger, and on December 10, 2018, the Merger was completed.  The materially false and misleading Proxy was an essential link in the consummation of the Merger, as the Stockholder Vote and resulting Merger could not have occurred without the dissemination of the Proxy.

8.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with California as to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

4

effect in this District; (ii) Oclaro maintained its primary place of business in this District; (iii) Lumentum maintains its primary place of business in this District; (iv) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff was, at all times relevant times, a common stockholder of Oclaro.

13.     Defendant Oclaro was a Delaware corporation and maintained its principal executive offices at 225 Charcot Avenue, San Jose, California 95131.  As a result of the Merger, Oclaro cease to exist.

14.     Defendant Marissa Peterson was, at all relevant times, a director of Oclaro, and also served as Chairman of the Board.

15.     Defendant Edward Collins was, at all relevant times, a director of Oclaro.

16.     Defendant Greg Dougherty ("Dougherty") was, at all relevant times, a director of Oclaro, and also served as the CEO of the Company.

17.     Defendant Kendall Cowan was, at all relevant times, a director of Oclaro.

18.     Defendant Denise Haylor was, at all relevant times, a director of Oclaro.

19.     Defendant Ian Small was, at all relevant times, a director of Oclaro.

20.     Defendant Bill Smith was, at all relevant times, a director of Oclaro.

21.     Defendant Joel A. Smith III was, at all relevant times, a director of Oclaro

22.     The defendants identified in paragraphs 14 through 21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

23.     Defendant Lumentum is a Delaware corporation and maintains its principal executive offices at 400 North McCarthy Boulevard, Milpitas, California 95035.  As a result of the Merger Oclaro merged with and into Merger Sub LLC, Merger Sub LLC survived as a direct wholly owned subsidiary of Lumentum, and Oclaro ceased to exist. Accordingly, Lumentum is named in their capacity as a surviving entity of the Merger.

5

24.     Merger Sub LLC is a Delaware limited liability company, maintains its principal executive offices at 400 North McCarthy Boulevard, Milpitas, California 95035, and is a direct wholly owned subsidiary of Lumentum.  Merger Sub LLC was formed on March 9, 2018, for the sole purpose of effecting the Merger.  Following the Merger, Oclaro merged with and into Merger Sub LLC, with Merger Sub LLC surviving as a direct wholly owned subsidiary of Lumentum Accordingly, Merger Sub LLC is named in their capacity as a surviving entity of the Merger.

25.     Merger Sub LLC, together with Oclaro, the Board, and Lumentum, are collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public stockholders of Oclaro (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

27.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of May 15, 2018, there were 170,656,367 shares of Oclaro common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Oclaro will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.      whether Defendants misrepresented or omitted material information in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

    ii.     whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

6

iii.    whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote for the Merger based on the materially false, incomplete, and/or misleading Proxy.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Company Background and the Merger

28.    Oclaro was one of the leading providers of optical components and modules for the long-haul, metro and data center markets.  Leveraging more than three decades of laser technology innovation and photonics integration, Oclaro provided differentiated solutions for optical networks and high-speed interconnects, which was driving the next wave of streaming video, cloud computing, application virtualization and other bandwidth-intensive and high-speed applications.

29.    Given the development in the datacenter business, where "cloud" companies are constantly adding and upgrading, Oclaro was well-positioned in a sector that was poised for considerable growth in the near future.

30.     Beginning in 2016, Oclaro initiated a plan to turn around the Company and maximize stockholder value.

31.     On November 1, 2016, the Company announced its financial results for the First Quarter 2017.  Notably, the Company reported revenue of $135.49 million, an increase of 54.8% in year-over-year performance and $3.84M above estimates, and net income of $20 million, representing a consecutive improvement over $14.4 million of net income in the fourth quarter of fiscal 2016 and a net loss of $1.6 million in the first quarter of fiscal 2016.[2]

32.     The Company's CEO, Defendant Dougherty, commented on the noteworthy results:

> I'm pleased to say that we started our first quarter of fiscal year 2017 the same way we ended fiscal '16, with a record quarter.  **Once again, the Oclaro team delivered the *best gross margin and operating income performance in our history, and exceeded our guidance in all areas*.**
>
> […]
>
> Our technology leadership in optical components and modules for bandwidth at 100 gigabits and beyond **has us well-positioned to continue to deliver solid growth** in both markets.  Our strong revenue results underpin **the highest gross margin and operating income in the history of Oclaro**…
>
> In addition to producing these excellent results, we continue to strengthen our balance sheet.  Early in the quarter, we retired $65 million of convertible debt followed by a very successful capital raise in September.  **By taking these actions we ended the quarter with $229 million of cash and essentially no debt**.  These resources will enable us to continue to invest to be the market leader in optics for 100 gigabits and beyond.[3]

33.     Pete Mangan ("Mangan"), Oclaro's Chief Financial Officer ("CFO"), further commented on the Company's outstanding performance and, more importantly, the Company's

---

[2]   Oclaro, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Press release issued by the Company on November 1, 2016) (Nov. 1, 2016).

[3]   *Oclaro's (OCLR) CEO Greg Dougherty on Q1 2017 Results - Earnings Call Transcript*, Seeking Alpha (Nov. 1, 2016), *available at* https://seekingalpha.com/article/4017992-oclaros-oclr-ceo-greg-dougherty-q1-2017-results-earnings-call-transcript.

projected future performance, stating "we currently expect revenues to grow in the quarter by *approximately 8% to 14%* and we'll be in the range of 146 million to 154 million. We expect non-GAAP gross margin in the range of 33% to 36% and non-GAAP operating income to improve to a range of $22 million to $26 million." *Id.*

34. In response to the Company's strong performance, investment bank Piper Jaffray Companies ("Piper Jaffray") raised its price target for Oclaro common stock to $13 from $9.50 a share (over the Company's closing stock price of $7.34 on November 1, 2016).[4] Piper Jaffray analyst Troy Jensen refered to the Company's "outstanding" Q1 results when explaining his more favorable outlook for the Company.

35. Oclaro followed up its historical First Quarter 2017 with a successful Second Quarter. On January 29, 2017, the Company announced its financial results for the Second Quarter, which Defendant Dougherty explained best:

> Our December quarter was very strong with improvement in all our financial metrics. **Revenue increased 14 percent from the first quarter of fiscal 2017, and 64 percent from the same quarter last year**, with demand for our newer 100G and beyond products driving this excellent growth. In addition, we had record gross margin and operating income resulting from higher revenue, a richer product mix, and favorable foreign exchange rates. **We currently forecast revenue to increase again in the March quarter, driven by healthy demand across the multiple markets we serve**.[5]

36. Based on the Company's continued success, guidance for the Third Quarter Fiscal Year 2017 included revenues in the range of $156 million to $164 million and non-GAAP operating income in the range of $32 million to $36 million. *Id.*

37. Financial analysts and market commentators were all impressed with Oclaro's strong growth and continued success.

[4] Oclaro: Piper is bullish following Q1 blowout results, Seeking Alpha (Nov. 2, 2016), *available at* https://seekingalpha.com/news/3219695-oclaro-piper-bullish-following-q1-blowout-results.

[5] *Oclaro Announces Second Quarter Fiscal Year 2017 Financial Results*, Seeking Alpha (Jan. 29, 2017), *available at* https://seekingalpha.com/pr/16728849-oclaro-announces-second-quarter-fiscal-year-2017-financial-results.

38.     For example, on February 1, 2017, Piper Jaffray raised its price target *again*, this time from $13 to $15.[6]  Once again, Piper Jaffray analyst Troy Jensen commented on his improved outlook for the Company:

> Oclaro reported FQ2 results in-line with the company's positive preannouncement, and provided upbeat FQ3 guidance, with revenues, gross margin and operating income all coming in ahead of consensus expectations.  Following these strong results, we believe Oclaro remains one of the best positioned optical companies to see this momentum continue throughout 2017, and believe sustained strength in China and ramping US Metro and Datacom orders represent three meaningful catalysts over the next several quarters. **While we took our estimates higher,** *we believe upside still exists to this forecast due to OCLR's CFP2-ACO leadership, as well as management's history of providing conservative guidance*.

*Id.* (emphasis added).  On February 1, 2017, Oclaro common stock closed at $9.45 per share.  As a result, Piper Jaffray's revised price target now implied an approximate **60% premium** to the Company's common stock price.

39.     David Zanoni, an analyst for the investor website Seeking Alpha, asserted that Oclaro stock was poised to outperform in light of the strong demand for the its products and strong growth.[7]  Zanoni further noted that "Oclaro expects to grow revenue by 25% to 30% in 2017. Consensus estimates show that Oclaro is expected to average about 26% annual revenue growth through 2019.  *I expect the stock to continue to run higher and outperform as revenue continues to grow at above average rates*." *Id.* (emphasis added).

40.     In closing, Zanoni stated that Oclaro's "strong continued product demand will **drive above average sales growth for the *next 2 to 3 years*.  This is a recipe for the stock to achieve gains that exceed its peers and the S&P 500 for the *foreseeable future***." *Id.* (emphasis added).

---

[6]   *Oclaro (OCLR) PT Raised to $15 at Piper Jaffray*, Street Insider (Feb. 1, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Oclaro+%28OCLR%29+PT+Raised+to+%2415+at+Piper+Jaffray/12484903.html.

[7]   *Oclaro: Stock To Outperform On Low Valuation And High Growth*, Seeking Alpha (Feb. 10, 2017), *available at* https://seekingalpha.com/article/4044924-oclaro-stock-outperform-low-valuation-high-growth.

10

41.     Shortly thereafter, on March 15, 2017, Needham & Company maintained its *Strong Buy* recommendation at $14 price target for Oclaro common stock.[8]   Needham analyst Alex Henderson stated that Oclaro shares are an "exceptional value." *Id.*  Oclaro common stock closed at $8.73 on March 15, 2017.

42.     On May 2, 2017, Oclaro announced its financial results for the Third Quarter Fiscal Year 2017.  While Chinese demand affected the Company, it did not prevent its success.  Indeed, Oclaro reported revenue of $162.2 million for the third quarter of fiscal 2017, in comparison to revenues of $153.9 million in the second quarter of fiscal 2017, or 5% growth over the prior quarter, and revenues of $101.1 million in the third quarter of fiscal 2016, representing 60% growth over the same quarter 1 year earlier.

43.     Particularly noteworthy was the Company's success in the 100-gig and beyond product portfolio.  As CFO Mangan noted, Oclaro's sales of 100-gig and beyond products "reached $125.8 million driven by our newer line side and client-side products, and increased 11% from last quarter and 115% from the same period 1 year ago."[9]

44.     Defendant Dougherty further explained the importance of the Company's success with its 100-gig and beyond products:

> The good news is that we believe the fundamental demand drivers in China remain intact.  And we anticipate growth from the region to return again later this year from metro and provincial networks deployment.  Another future growth driver for China will be the deployment of 5G wireless technology.  *China is driving to be the first country to deploy 5G and is targeting 2019 to do so…We believe that **we are uniquely positioned to be successful in this new very large emerging market**.*
>
> […]

---

[8]  *Needham & Company Reiterates Strong Buy Rating and $14 PT on Oclaro (OCLR); 'Shares are an Exceptional Value'*, Street Insider (March 15, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Needham+%26+Company+Reiterates+Strong+Buy+Rating+and+%2414+PT+on+Oclaro+%28OCLR%29%3B+Shares+are+an+Exceptional+Value/12669284.html.

[9]  *Oclaro's (OCLR) CEO Greg Dougherty on Q3 2017 Results - Earnings Call Transcript*, Seeking Alpha (May 2, 2017), *available at* https://seekingalpha.com/article/4068225-oclaros-oclr-ceo-greg-dougherty-q3-2017-results-earnings-call-transcript.

1

2

3

4

5

> Despite the near-term headwinds, given our technology leadership in 100 gig and beyond, **we remain bullish about the prospects for future growth in the markets that we serve. We currently expect to show a revenue growth again in the September quarter.** And as a result, we project that our sales for calendar year 2017 will grow by approximately 20% compared to 2016.

6    *Id.* (emphasis added).

7        45.    Despite the negative market conditions in China, analysts continued to remain

8    optimistic on the Company's future outlook.

9        46.    On June 19, 2017, financial analyst Ophir Gottlieb authored an in-depth analysis of

10   the Company, highlighting its recent growth and *potential for substantial future growth*. To start,

11   Gottlieb noted that "[d]emand for bandwidth and low latency in the core network continues to

12   explode, with video services, cloud computing, voice over IP and social media driving more

13   network traffic."[10]   Indeed, traffic growth on **mobile alone** is expected to *increase 1,000%* **in 6**

14   **years**. *Id.*  Accordingly, companies that are capable of providing higher speed data and telecom

15   are poised to be "winners." *Id.*

16       47.    Gottlieb then discussed the growth cycle market drivers that Oclaro identified and

17   anticipated would facilitate substantial growth to the Company's core products.

18       48.    For example, Oclaro expects its total addressable market ("TAM") to grow at **47%**

19   **CAGR** *through 2020*, taking a $150 million market to **over $1 billion**, as illustrated below:

20

21

22

23

24

25

26

---

27   [10]   *Oclaro Has An Opportunity In The Data And Speed Revolution*, Seeking Alpha (June 19,

28   2017), *available at* https://seekingalpha.com/article/4082219-oclaro-opportunity-data-speed-revolution.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



Source: Optical Equipment - DCI Hardware; Cignal AI, 2017

*Id.* The **seven-fold growth** gave reason for investors to be bullish.

49.     Similarly, the 100G market—one of Oclaro's strongest segments—was expected to see TAM growing at **24%** CAGR, thereby turning a $400 million market into an **over $2 billion by 2020, or a five-fold rise**. *Id.*

50.     With respect to the Company, Gottlieb noted that "[w]e can see across the speed spectrum that Oclaro has products in production and development to satisfy the bursting needs for speed and data handling." *Id.* Gottlieb also highlighted the Company's financials, in particular that "**[r]evenue (TTM) has increased for** *seven consecutive quarters*, **which triggers a 'trend.'** It has now reached $577 million, compared to last year when it was $365 million, which is a 58.1% 1-year change." *Id.* Similarly, "[g]ross margin % for Oclaro is 37.1%, up from 25.2% last year,

which is a 47% 1-year rise.  When dealing with companies that have hardware and services, we pay special attention to gross margins.  If the measure is decreasing, we're looking at a company with weakening pricing strength - that means competition is coming.  **With Oclaro, we see the opposite.**" *Id.*

51.    On July 7, 2017, Stifel Financial Corporation raised its price target for Oclaro common stock to $12 and maintained a *Buy* rating.

52.    Also on July 7, 2017, Shareholders Unite published a similar, in-depth analysis of the Company, which further demonstrated that "Oclaro is undervalued."[11]

53.    Indeed, just as Gottlieb acknowledged, Shareholders Unite further pointed out that "that **demand is booming** for higher end datacom products (100G+)," which is one of segments that Oclaro thrives in.  Indeed, **100G+ happened to be Oclaro's (OCLR) main source of revenue**, as Defendant Dougherty stated in the Q3 2017 Results - Earnings Call:

> Our results reflect the **continuing strength of our 100-gig and beyond product portfolio**, which grew to $126 million in sales and represented 78% of our total revenue for the quarter.  This growth was fueled by shipments of our market leading CFP2-ACO and our emerging QSFP28 product family into the metro and data center markets."

54.    Shareholders Unite then discussed the Company's future outlook, noting that it has become less reliant on its Chinese consumers and diversified its consumer base.  *Id.*  Furthermore, Oclaro's financials indicated that the company "is strong…and has a ***history of beating expectations***."  *Id.* (emphasis added).

55.    While Oclaro had been experiencing prolonged growth and historic success, the Company's common stock performance was interrupted in mid-June 2017 when rumors began to circulate in the marketplace that the Company was preparing for a sale.

56.    On August 2, 2017, the Company reported its Fourth Quarter and Fiscal Year 2017 financial results.  Defendant Dougherty summarized the Company's incredible performance when

---

[11] *Oclaro Is Undervalued*, Seeking Alpha (July 7, 2017), *available at* https://seekingalpha.com/article/4086381-oclaro-undervalued.

stating "I am incredibly proud of what the Oclaro team accomplished during the past year. We posted *year-over-year* **revenue growth of 47 percent**, *while also delivering significantly higher profits*. Our excellent results were driven by the strength of our 100G and beyond product portfolio whose revenue doubled over fiscal year 2016."[12]

57.   Defendant Dougherty concluded the Company's Fourth Quarter and Fiscal Year 2017 earnings call by stating:

> [W]e had an outstanding fiscal year 2017, our position in the data center and metro market looks very good.  With highly differentiated products and a new product pipeline that will offer us **exciting opportunities in the future.  We have also further diversified our customer and geographical mix.  We are well positioned for our new year** as we commence it with strong set of 100 gig and beyond product, which are ramping well.  **Our strong customer market positions,** *plus a very strong financial model give us very many reasons to be optimistic*. [13]

58.   On September 15, 2017, Raymond James issued a *Strong Buy* and $12 price target for Oclaro common stock, implying a **36.8%** upside from the stock's closing price of $9.07.

59.   In sum, prior to Lumentum introducing itself into the sales process, Oclaro was a very successful company that had positioned itself for an even brighter future.  As discussed above: (i) the Company had experienced historic financial accomplishments over consecutive quarters, often exceeding its own financial expectations; (ii) Oclaro management and key executives had repeatedly reaffirmed the Company's optimistic and promising future financial performance; (iii) financial analysts repeatedly issued optimistic price targets for the Company's stock, which were further supported by favorable analyst commentary; and (iv) perhaps most importantly, the Company had strategically reduced its dependency on certain clients, diversified its customer and

---

[12] *Oclaro Announces Fourth Quarter and Fiscal Year 2017 Financial Results*, Seeking Alpha (Aug. 2, 2017), *available at* https://seekingalpha.com/pr/16904915-oclaro-announces-fourth-quarter-fiscal-year-2017-financial-results.

[13]  Oclaro's (OCLR) CEO Greg Dougherty on Q4 2017 Results - Earnings Call Transcript, Seeking Alpha (Aug. 3, 2017), *available at* https://seekingalpha.com/article/4094108-oclaros-oclr-ceo-greg-dougherty-q4-2017-results-earnings-call-transcript.

geographical base, and was prepared to implement a strategy that provided "many reasons to be optimistic" about Oclaro's future.

60.    In other words, Oclaro had continually demonstrated that it was a thriving Company that had advantageously positioned itself in the marketplace to continue to capitalize on consumer demands and growing markets (*e.g.,* the 100G market), which would help ensure the Company's continued success, as a standalone business, for the foreseeable future.

61.    On November 1, 2017, Oclaro reported its First Quarter Fiscal Year 2018 financial results.  Despite producing "strong quarterly results" that "generated sequential revenue growth and strong profitability,"[14] as stated by Defendant Dougherty, the market ignored the Company's overall profitability and, instead, reacted negatively to the Company's results out of China.  This was particularly interesting in light of the fact that the Company had been making a conscious effort, and successfully been doing so (as Defendant Dougherty confirmed during the Company's Fourth Quarter and Fiscal Year 2017 earnings call on August 3, 2017), to diversify the Company beyond the Chinese market.  Indeed, the Company had been quietly growing rapidly in other geographic areas, such as the Americas.  For example, Mexico had gone from 7% of the Company's revenue in the First Quarter of Fiscal Year 2017 to **19%** of Oclaro's revenue in the First Quarter of Fiscal Year 2018, making it the Company's third-largest single country market only behind China and the United States.[15]

62.    It is against this brief blemish in Oclaro's performance that Lumentum emerged as a potential acquirer of the Company.  The only flaw to this plan was that the China market was merely a temporary, near-term headwind that no one expected to be permanent, let alone last much longer.[16]

---

[14]   *Oclaro Announces First Quarter Fiscal Year 2018 Financial Results*, Seeking Alpha (Nov. 1, 2017), *available at* https://seekingalpha.com/pr/16987887-oclaro-announces-first-quarter-fiscal-year-2018-financial-results.

[15]   *Oclaro: The Market Doesn't Appreciate This Tech Company's Growth*, Seeking Alpha (March 2, 2018), *available at* https://seekingalpha.com/article/4152793-oclaro-market-appreciate-tech-companys-growth.

[16]   *See, e.g., id.*; *Oclaro Et. Al.: China's Optical Market Recovers, But Slowly, Says Rosenblatt*, Barron's (Dec. 12, 2017), *available at* https://www.barrons.com/articles/oclaro-et-al-chinas-

63. On November 8, 2017, Defendant Dougherty met with Alan Lowe, Lumentum's CEO. During the meeting, Mr. Lowe communicated Lumentum's **_initial interest_** in acquiring Oclaro. *See* Proxy at 81.

64. Subsequently, on December 15, 2017, Oclaro entered into a nondisclosure agreement with Lumentum.

65. On December 12, 2017, Rosenblatt Securities' analyst Jun Zhang maintained his $10 price target, implying an approximately **42% upside** from the stock's closing price of $7.07 per share, and *Buy* rating for Oclaro securities. In support of his position, Zhang explained that he believed that the Company's module business in China does not appear as weak as currently modeled.[17]

66. By February 2018, Oclaro's financial outlook already started improving.

67. Indeed, on February 5, 2018, Defendant Dougherty stated, "[d]espite the known headwinds facing our industry, the Oclaro team once again produced a very good quarter…"[18]

68. Defendant Dougherty further commented on the Company's performance and that he was "pleased with [Oclaro's] strong financial performance for the December quarter and although March will be more than seasonally tough for the reasons that I will highlight later, **[the Company is] very well positioned for growth, starting in June.**" *Id.*

69. Later during the earnings call, Defendant Dougherty expanded on his reasons why investors should be **optimistic** about the Company's near future:

> The primary growth driver in Q3 will be the expected recovery of revenue for the CFP2-ACO family. *Growth in ACO will counter a good portion of the headwinds. Our position in the CFP2-ACO market remains very strong.* Well, some competitors have entered

---

optical-market-recovers-but-slowly-says-rosenblatt-1513092012.

[17] *Oclaro (OCLR): China Biz Is Not As Bad As We Thought – Rosenblatt*, Street Insider (Dec. 12, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Oclaro+%28OCLR%29%3A+China+Biz+Is+Not+As+Bad+As+We+Thought+-+Rosenblatt/13591398.html .

[18] *Oclaro's (OCLR) CEO Greg Dougherty on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 5, 2018), *available at* https://seekingalpha.com/article/4143337-oclaros-oclr-ceo-greg-dougherty-q2-2018-results-earnings-call-transcript.

the market recently.  We have seen very little erosion of our market share.  In large part, *our market position is solidified by the long-term contracts that we have signed with major ACO customers.  In fact, we just recently signed another contract extension with one of our key customers.*

We believe the last quarter's drop in ACO family sales was primarily due to market conditions.  *We expect our Q3 revenue from the ACO family or product to return to the September 2017 levels and to show **year-over-year revenue growth in calendar 2018, while maintaining very good gross margins**.*  We are also hearing from our customers that Verizon's metro builds are accelerating which is also a very good news for us.

[…]

As we look past to the March quarter, *we have **many reasons for optimism starting with the expectation that many of the headwinds we mentioned earlier should be largely behind us or diminished**.*  We also continue to believe that the fundamental growth drivers through bandwidth they may impact and *should help us resume **revenue growth again in the June quarter***.

*Beyond March, **we expect to see growth** in a variety of products in both the telecom and datacom sectors*.  In telecom, we expect the major growth drivers to be our ACO and 400 gig families.

*Id.* (emphasis added).

70.     Notably, Defendant Dougherty's reference to Oclaro's return to ACO family performance during September 2017 was particularly optimistic, as during that time period the Company's ACO products "fueled" the Company's strong quarterly results, which included "sequential revenue growth and strong profitability."[19]

71.     Defendant Dougherty also provided further insight into how the Company has uniquely positioned itself for future growth, stating:

The global 400 gig QSFP56 DD market is **projected to be $280 million in 2019 and grow to $720 million in 2020.  Our 400 gig EML lasers are already recognizes the best high-speed lasers in the world.** We believe that by leveraging our EMLs, we will have a

---

[19]  *Oclaro's (OCLR) CEO Greg Dougherty on Q1 2018 Results - Earnings Call Transcript*, Seeking Alpha (Nov. 1, 2017), *available at* https://seekingalpha.com/article/4119393-oclaros-oclr-ceo-greg-dougherty-q1-2018-results-earnings-call-transcript.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
SECURITIES EXCHANGE ACT OF 1934

1
2
very strong market position in this emerging area. We intend to
begin shipping QSFP56 DD transceivers later in calendar year 2018.

3
*Id.*

4
72.     Perhaps most interesting is that during the Question-and-Answer Session of the

5
earnings call, Defendant Dougherty affirmed that the Company was **remaining consistent** with

6
the guidance discussed during the Company's First Quarter 2018 earnings call approximately *3*

7
*months earlier*.[20] However, despite confirming that the Company's future outlook had not changed

8
during the Second Quarter 2018 earnings call, Company management was contemporaneously

9
*downgrading* Oclaro's projections, as illustrated by considerably more pessimistic January

10
Projections and February Projections.

11
73.     Defendant Dougherty concluded the Company's Second Quarter 2018 earnings call

12
by further emphasizing that Oclaro remains "***very confident in our future prospects.  We currently***

13
***believe the Q3 revenue will represent the bottom for us.  And we will return the sales growth in***

14
***Q4***." *Id.* (emphasis added).

15
74.     Following the announcement of the Company's Second Quarter 2018 earnings and

16
statements made by key members of management during the earnings call, a financial

17
commentator discussed how Oclaro's situation is already changing, noting that "[t]he [C]ompany

18
retains a *fortress balance sheet and is navigating the storm* maintaining decent margins [and]

19
[n]ew products to be launched soon provide the *necessary growth drivers*."[21]

20
75.     On February 15, 2018, Lumentum submitted a non-binding written indication of

21
interest to acquire Oclaro at a purchase price of $8.35 per share of Oclaro common stock,

22
consisting of cash consideration of $6.60 in cash and Lumentum common stock equivalent to

23
$1.75.  *See* Proxy at 84.

24
25
26
27
28

---

[20]   *Oclaro's (OCLR) CEO Greg Dougherty on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 5, 2018), *available at* https://seekingalpha.com/article/4143337-oclaros-oclr-ceo-greg-dougherty-q2-2018-results-earnings-call-transcript.

[21]   *Oclaro: The Situation Is Changing Already*, Seeking Alpha (Feb. 7, 2018), *available at* https://seekingalpha.com/article/4143964-oclaro-situation-changing-already.

76.     The Board meeting held on February 21, 2018 demonstrated the considerable difference each party assigned to Oclaro's value.  Indeed, after discussing the Lumentum proposal, the Board instructed Defendant Dougherty to continue discussion with Lumentum and present a counteroffer to Lumentum of $9.90 per share of Oclaro common stock, implying an **approximately 20% premium** over what Lumentum had initially proposed on February 15, which was a **discount** to the Company's most recently issued price target.

77.     At some point during the negotiations process, Company management recognized the looming problem it would soon be facing: Oclaro projections that would allow Jefferies to prepare valuation analyses in support of its fairness opinion that would demonstrate the "fairness" of the Merger Consideration—comprised of $5.60 in cash and 0.0636 of a share of Lumentum common stock.  As a result, Oclaro management prepared a further downward adjusted set of projections—the February Projections—which were not provided to Lumentum and, instead, provided solely to Jefferies for the preparation of its fairness opinion.

78.     On March 2, 2018, financial commentator David Trainer discussed how Oclaro's stock price ***considerably undervalues*** the Company's true value.  Specifically, Trainer explained that the markets "ignored the overall profitability of the company and focused on disappointing results out of China,"[22] which was further confirmed in discounted cash flow ("DCF") model that showed Oclaro's stock was worth approximately **$11 per share**, illustrating an **65% premium** to the current stock price and a **32% premium** to the then-proposed Merger Consideration.  *Id.*

79.     However, Oclaro's public common stockholders would never have the opportunity to reap the benefits of their investment and realize the true value of the Company.

80.     On March 11, 2018, Oclaro and Lumentum executed the Merger Agreement.

81.     On March 12, 2018, Oclaro and Lumentum issued a joint press release announcing the execution of the Merger Agreement.

---

[22]   *Oclaro: The Market Doesn't Appreciate This Tech Company's Growth*, Seeking Alpha (March 2, 2018), *available at* https://seekingalpha.com/article/4152793-oclaro-market-appreciate-tech-companys-growth.

82.     True to Oclaro's established pattern of under-selling and over-delivering, when the Company reported its Third Quarter Fiscal Year 2018 financial results on May 6, 2018, which either exceeded or were on the upper-end of the guidance.  Specifically, as stated by Defendant Dougherty, revenue was $127 million for the quarter, in addition to "non-GAAP operating income of $18 million, **which *exceeded our guidance, and marked the eighth consecutive quarter of double-digit operating income percentage*.**"[23]

## II.     Defendants Authorized the Proxy to be Disseminated to Oclaro's Stockholders, Which Provided a Misleading Picture of Oclaro's and Lumentum's Respective Valuations and Future Financial Prospects

83.     On June 1, 2018, Defendants solicited Oclaro's stockholders to vote in favor of the Merger by causing the misleading Proxy to be filed with the SEC and disseminated to the Company's stockholders.  The Proxy, which recommended that Oclaro stockholders vote in favor of the Merger, misrepresented and/or omitted material information about the intrinsic value of the Company and the future prospects of Oclaro and Lumentum, and forced Oclaro's stockholders to cast an uninformed vote.

84.     Specifically, as noted above, the Proxy contained the following false and/or misleading material statements: (i) that the January Projections and February Projections "were prepared on a *reasonable basis*, reflecting the best currently available estimates and judgments at the time of their preparation," and reflected the "*good faith judgments* of the management of Oclaro as to the *future financial performance of Oclaro*,"; (ii) the January Projections and the February Projections themselves; and (iii) the implied equity reference ranges per share that were calculated by Jefferies using the downwardly revised February Projections.

85.     Additionally, the Proxy omits the Lumentum Forecasts despite the Proxy repeatedly referring to the future prospects of Lumentum as a positive reason for the Merger and indicating that they were provided to and utilized by Jefferies to find the Merger "fair" to Oclaro stockholders. The omission of this material information renders the statements made referring to

---

[23]   *Oclaro Announces Third Quarter Fiscal Year 2018 Financial Results*, Seeking Alpha (May 6, 2018), *available at* https://seekingalpha.com/pr/17155761-oclaro-announces-third-quarter-fiscal-year-2018-financial-results.

the forecasts, including Oclaro's Reasons for the Merger and the Lumentum Selected Transactions Multiples analysis, misleadingly incomplete.

86.     First, the *Certain Unaudited Prospective Financial Information* section of the Proxy discloses three separate and distinct variations of Oclaro's projected future financial performance: the December Projections, the January Projections, and the February Projections. Each iteration was created by Oclaro's management and "*prepared on a reasonable basis*, reflecting the best currently available estimates and judgments at the time of their preparation." Proxy at 105 (emphasis added).

87.     The Proxy further discloses that the Oclaro Projections "were *reasonably prepared* on bases reflecting the best currently available estimates and *good faith judgments* of the management of Oclaro as to the future financial performance of Oclaro." Proxy at 97 (emphasis added).

88.     However, the January Projections and the February Projections—the latter of which was utilized by Jefferies as the fundamental inputs underlying each of the valuation analyses for Oclaro prepared in connection with its fairness opinion—both reflect unwarranted and substantial downward adjustments to the December Projections, which rendered them materially false and misleading.

89.     Below are the three sets of Oclaro projections:

**December Projections**
*(Dollars in millions, except for per share amounts)*

|  | 2017A | 2018E | 2019E | 2020E |
|---|---|---|---|---|
| Revenue | $ 601 | $ 555 | $ 657 | $ 919 |
| Gross Margin | $ 237 | $ 206 | $ 255 | $ 360 |
| Non-GAAP Operating Income (1) | $ 131 | $ 88 | $ 131 | $ 210 |
| Adjusted EBITDA (2) | $ 152 | $ 119 | $ 177 | $ 266 |
| Free Cash Flow (3) | $ 79 | $ 53 | $ 132 | $ 214 |

**January Projections**
*(Dollars in millions, except for per share amounts)*

|  | 2017A | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|
| Revenue | $ 601 | $ 551 | $ 580 | $ 709 | $ 784 |
| Gross Margin | $ 237 | $ 212 | $ 232 | $ 280 | $ 304 |
| Non-GAAP Operating Income (1) | $ 131 | $ 94 | $ 109 | $ 145 | $ 159 |
| Adjusted EBITDA (2) | $ 152 | $ 125 | $ 149 | $ 193 | $ 212 |
| Free Cash Flow (3) | $ 79 | $ 66 | $ 111 | $ 148 | $ 168 |
| Adjusted EPS (4) | $0.79 | $0.55 | $0.61 | $0.79 | $0.88 |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

**February Projections**
*(Dollars in millions, except for per share amounts)*

| | 2017A | 2018E | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|
| Revenue | $ 601 | $ 551 | $ 580 | $ 709 | $ 784 | $ 835 |
| Gross Margin | $ 237 | $ 212 | $ 232 | $ 279 | $ 304 | $ 323 |
| Non-GAAP Operating Income (1) | $ 131 | $ 94 | $ 109 | $ 144 | $ 159 | $ 173 |
| Adjusted EBITDA (2) | $ 152 | $ 125 | $ 149 | $ 192 | $ 212 | $ 227 |
| Free Cash Flow (3) | $ 79 | $ 66 | $ 111 | $ 147 | $ 168 | $ 179 |
| Unlevered Free Cash Flow (5) | $ — | $ 32 | $ 53 | $ 80 | $ 78 | $ 104 |
| Adjusted EPS (6) | $0.79 | $0.54 | $0.53 | $0.69 | $0.75 | $0.78 |

90.     To illustrate the substantial impact that the downward adjustments made by Oclaro's managements had on the Company's financial projections, in particular the adjustments made from the *original* December Projections verses the *final* February Projections, below are charts comparing the different iterations of the Oclaro Projections:

***Comparison of December Projections vs. January Projections[24]:***

| | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|
| Revenue | $0 | ($4) | ($77) | ($210) |
| *Percent Change* | *0%* | *(0.72%)* | *(11.72%)* | *(22.85%)* |
| Gross Margin | $0 | $6 | ($23) | ($80) |
| *Percent Change* | *0%* | *2.91%* | *(9.02%)* | *(22.22%)* |
| Non-GAAP Operating Income | $0 | $6 | ($22) | ($65) |
| *Percent Change* | *0%* | *6.82%* | *(16.79%)* | *(30.95%)* |
| Adjusted EBITDA | $0 | $6 | ($28) | ($73) |
| *Percent Change* | *0%* | *5.04%* | *(15.82%)* | *(27.44%)* |
| Free Cash Flow | $0 | $13 | ($21) | ($66) |
| *Percent Change* | *0%* | *24.53%* | *(15.91%)* | *(30.84%)* |

***Comparison of December Projections vs. February Projections[25]:***

| | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|
| Revenue | $0 | ($4) | ($77) | ($210) |
| *Percent Change* | *0%* | *(0.72%)* | *(11.72%)* | *(22.85%)* |
| Gross Margin | $0 | $6 | ($23) | ($81) |

[24]   Adjusted EPS and fiscal year 2021 have both been omitted from the chart due to the fact that the December Projections were only prepared for the fiscal years 2017 through 2020 and did not include Adjusted EPS projections.

[25]   Adjusted EPS and unlevered free cash flow ("UFCF") and fiscal years 2021 and 2022 have all been omitted from the chart due to the fact that the December Projections were only prepared for the fiscal years 2017 through 20202 and did not include Adjusted EPS and UFCF projections.

| | | | |
|---|---|---|---|
| *Percent Change* | *0%* | *2.91%* | *(9.02%)* | *(22.50%)* |
| Non-GAAP Operating Income | $0 | $6 | ($22) | ($66) |
| *Percent Change* | *0%* | *6.82%* | *(16.79%)* | *(31.43%)* |
| Adjusted EBITDA | $0 | $6 | ($28) | ($74) |
| *Percent Change* | *0%* | *5.04%* | *(15.82%)* | *(27.44%)* |
| Free Cash Flow | $0 | $13 | ($53) | ($67) |
| *Percent Change* | *0%* | *24.53%* | *(15.91%)* | *(31.31%)* |

91.     Such drastic reductions had a dramatic impact of the future financial picture of Oclaro. Most concerning is that the later years in projections, which suffered the greatest downgrade, have a greater impact[26] on the discounted cash flow analysis, which is widely-regarded as the most important valuation methodology.[27][28][29]   Consequently, while the comparison of the changes made to year 2020 December Projections verses the year 2020 February Projections was already alarming, stockholders were unable to assess the more heavily-weighted negative impact that the two additional years included in the February Projections had on Oclaro's valuation.

---

[26] *Terminal Value Calculations in a Financial Model*, Corality, *available at* http://www.corality.com/tutorials/estimating-terminal-value ("An estimate of terminal value is critical in financial modelling as it accounts for a large percentage of the project value in a discounted cash flow valuation."); *Terminal Value*, Macabacus, *available at* http://macabacus.com/valuation/dcf/terminal-value (indicating that the shorter the length of the projections, the greater an impact on the DCF analysis because "the terminal value can constitute approximately *75% of the value in a 5-year DCF* and 50% of the value in a 10-year DCF.").

[27] "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[28] "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[29] "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014.

24

92.    The downward revisions decrease the free cash flows from the December Projections to February Projections by over 31%.[30] Such a substantial decrease undoubtedly had a significant impact of the valuation of Oclaro and the implied equity reference range found in Jefferies Discounted Cash Flow Analysis. And if you were to correspondingly increase the values of implied reference range by 31%, the purported value of the Merger Consideration would fall at the very bottom, if not outside the range of fairness entirely. Only by using the downward revisions to the Oclaro Projections would the value of the Merger Consideration be found as "fair" to Oclaro stockholders. Thus, the February Projections were made to present the sale of Oclaro as "fair," not to reflect management's legitimately held views.

93.    Moreover, as indicated by the numerous statements made during the earnings call in February 2018 and the institutional investors presentation in March 2018, the adjustments made could not have been prepared on a reasonable, good-faith basis, because they do not reflect management's legitimately held views regarding Oclaro's true future prospects. Indeed, Defendant Dougherty made statements *immediately before, during, and after* each iteration of the Oclaro Projections were prepared asserting that Oclaro was well-positioned and poised for growth as early as the fourth quarter 2018,[31] thereby refuting the substantially more pessimistic view of the Company portrayed in the January Projections and February Projections.  As detailed herein, (i) Oclaro had repeatedly met or exceeded management's guidance in the period leading up to, and subsequent to, the signing of the Merger Agreement (*see, e.g,* ¶¶ 32-33, 35, 82); and (ii) certain key Oclaro employees, in particular Defendant Dougherty, had repeatedly touted the Company's

---

[30]   As mentioned in Footnotes 26 and 27, the December Projections only covered the years 2017 through 2020, while the February Projections—which were used by Jefferies in its valuation analyses—covered the years 2017 through 2022.  Particularly concerning in this regard is that the reductions in each valuation metric—Revenue, Non-GAAP Operating Income, and, most importantly, Free Cash Flow—*progressively increased* in each year and, as a result, it stands that had the December Projections been prepared for the same 2017 through 2022 time period, the downward adjustments made in the February Projections would exceed 31%, and thereby further depress the calculated implied equity reference ranges per share.

[31]   *Oclaro's (OCLR) CEO Greg Dougherty on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 5, 2018), *available at* https://seekingalpha.com/article/4143337-oclaros-oclr-ceo-greg-dougherty-q2-2018-results-earnings-call-transcript.

1   improvement and financial success about the Company's expected future performance (*see, e.g.,*

2   ¶¶ 32, 35, 44, 56-57, 68-70, 73, 83).

3      94.    In an attempt to "explain" the severe downgrade in the January Projections and the

4   February Projections, the *Certain Unaudited Prospective Financial Information* section of the

5   Proxy simply details the specific downward adjustments that were made to the December

6   Projections:

> The December Projections assumed that Oclaro's business would
> achieve revenue growth over the forecast period, supporting a
> compound annual growth rate ("CAGR") of 28.7% from 2018 to
> 2020 for overall Oclaro revenue, a CAGR of 49.4% for Adjusted
> EBITDA, and a CAGR of 51.4% for non-GAAP net income (all as
> defined below). The January Projections assumed that Oclaro's
> business would achieve revenue growth over the forecast period,
> supporting a CAGR of 12.5% from 2018 to 2021 for overall Oclaro
> revenue, a CAGR of 19.4% for Adjusted EBITDA, a CAGR of
> 18.9% for non-GAAP net income and a CAGR of 17.0% for
> Adjusted EPS (as defined below). The December Projections and
> January Projections were provided to the Oclaro Board and to
> Jefferies. In connection with the evaluation of a possible transaction
> with Lumentum, Oclaro provided Lumentum with the December
> Projections and the January Projections.
>
> The February Projections assumed that Oclaro's business would
> achieve revenue growth over the forecast period, supporting a
> CAGR of 10.9% from 2018 to 2022 for overall Oclaro revenue, a
> CAGR of 16.2% for Adjusted EBITDA, a CAGR of 10.6% for non-
> GAAP net income and a CAGR of 9.3% for Adjusted EPS. The
> February Projections were provided to the Oclaro Board and to
> Jefferies, and were not provided to Lumentum.

Proxy at 105.  The Proxy entirely fails to disclose **any reason or rationale** from the Proxy that

would explain, support, and/or justify the unreasonable downgrade in Oclaro's CAGR in the

January Projections and February Projections.  *See* Proxy at 105. The complete omission of any

supporting explanation for such drastic reductions to the future value of the Company creates a

strong inference that no valid explanation existed.

      95.    Below is a chart illustrating the changes that were made to Oclaro's CAGR for the

following metrics:

26

|  | Revenue | Adjusted EBITDA | Non-GAAP Net Income | Adjusted EPS |
|---|---|---|---|---|
| **December Projections** | 28.7% | 49.4% | 51.4% | N/A |
| **January Projections** | 12.5% | 19.4% | 18.9% | 17.0% |
| **Change** | (16.2%) | (30.0%) | (32.5%) | N/A |
| **February Projections** | 10.9% | 16.2% | 10.6% | 9.3% |
| **Change** | (1.6%) | (3.2%) | (8.3%) | (7.7%) |
| **Total Change** | **(17.8%)** | **(33.2%)** | **(40.8%)** | (7.7%) |

96.     To fully appreciate the impact the considerable reduction in Oclaro's CAGR between the three sets of projections, it is important to first understand that CAGR represents the mean annual growth rate of an investment over a specified period of time.[32]  It signifies **one of the most accurate ways to calculate and determine returns** for individual assets, investment portfolios and anything that can rise or fall in value over time.  *Id.*

97.     In other words, CAGR is a pro forma number that tells you what an investment yields on an annually compounded basis—*indicating to investors what they really have at the end of the investment period.  Id.*

98.     On March 7, 2018, *after the February Projections had been prepared*, Defendant Dougherty made a presentation at the Raymond James & Associates' 39th Annual Institutional Investors Conference.  On the third page of the slideshow, Defendant Dougherty represented that Oclaro has "**strong financials**" and is "well positioned in **high growth markets**."[33]

99.     The slideshow contains slides that further refute the substantial downward adjustments to Oclaro's CAGR:

---

[32]   *Compound Annual Growth Rate: What You Should Know*, Investopedia (Feb. 26, 2018), *available at* https://www.investopedia.com/investing/compound-annual-growth-rate-what-you-should-know/.

[33]   *Oclaro (OCLR) Presents At Raymond James 39th Annual Institutional Investors Conference – Slideshow*, Seeking Alpha (March 8, 2018), *available at* https://seekingalpha.com/article/4154606-oclaro-oclr-presents-raymond-james-39th-annual-institutional-investors-conference-slideshow.





- 5G Wireless Schedule:
  - Field Trials – 2017; Pre-Commercial - 2018-2019; Commercial Launch - 2020
- 25G SFP28 transceivers to be used in Point to Point Fronthaul from BBU to cell tower.
- 10G DWDM Tunable transceivers used in Point to Point Fronthaul applications where fiber plant is scarce.
- **Oclaro leads the market with 25G SFP28 and 10G DWDM Tunable SFP+ I-Temp solutions**

OCLARO   © 2018 Oclaro, Inc.  | Confidential and Proprietary                                    21

*Id.* at 21.







OCLARO   © 2018 Oclaro, Inc.  | Confidential and Proprietary                                    22

*Id.* at 22.

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
SECURITIES EXCHANGE ACT OF 1934**

100.    The Defendants further misled the Company's stockholders when they disclosed projections that covered *different* periods of time. Indeed, to accurately compare CAGR's, it is *necessary* to use the *same time periods*.[34] However, as depicted below, the December Projections covered the years 2017 through **2020**, while the January Projections covered the years 2017 through **2021** and the February Projections covered the years 2017 through **2022**. Consequently, stockholders were **entirely impaired** from accurately comparing the changes made to Oclaro's CAGR due to the fact that **none** of the sets of projections were prepared for the same period of time.

101.    Furthermore, the implied per share equity reference ranges disclosed in the Proxy were misleading representations of the Company's true value. These statements were based upon the materially false and misleading February Projections that were prepared by Oclaro management and *exclusively* utilized by Jefferies in connection with the preparation of its fairness opinion and underlying valuation analyses.  *See* Proxy at 100 (disclosing that the *Discounted Cash Flow Analysis* was performed using the February Projections provided by Oclaro's management); *id.* at 100-01 (relying upon "Oclaro's estimated adjusted earnings per share, for calendar year 2018 and 2019, as provided by Oclaro's management as part of the February Projections" for the *Selected Publicly Traded Companies Analysis*); *id.* at 102 (using "Oclaro's estimated revenue for fiscal year 2018, provided by Oclaro's management as part of the February Projections").

102.    These equity reference ranges were materially misleading because the Individual Defendants were aware that the downwardly adjusted January Projections and February Projections were materially false and misleading in that they did not reflect Oclaro's true future financial prospects.  Consequently, by making these statements the Proxy misled stockholders into believing that the Merger Consideration was actually fair value for Oclaro shares,[35] and that the Merger was in the best interest of Oclaro stockholders.

---

[34]    *Compound Annual Growth Rate: What You Should Know*, Investopedia ("When using the CAGR, it is important to remember two things: 1. The CAGR does not reflect investment risk [and] 2. **You must use the same time periods**.") (emphasis added).

[35]    This is especially true when viewed in connection with the Proxy's numerous statements regarding the opinion of the Board that "the Merger Agreement and the transactions contemplated

103.   In other words, the implied per share equity reference ranges misled Oclaro stockholders as to what they were actually giving up for the Merger Consideration.  The mythical business that was presented in the Proxy and valued using the February Projections resulted in implied equity reference ranges per share for Oclaro that were false and misleading in that they led Company stockholders to believe the Merger Consideration was "fair."

104.   Therefore, despite Defendants being fully aware that there is no more material information to stockholders than the information underlying or supporting the financial value of their shares and the merger consideration being offered, Defendants misrepresented the above-mentioned material information to Oclaro stockholders.  The downward reductions made to the Oclaro Projections were not made in "good faith" and there was no "reasonable basis" for them—in fact, no basis at all for revisions was even disclosed. Thus, the January Projections and the February Projections reflected a misleading picture of Oclaro's future financial performance, and the implied valuation ranges based off these misleading projections directly misled Oclaro stockholders as to the true value of their shares.

105.   In addition to the preceding false and/or misleading statements discussed above, the Proxy also omitted material information concerning the "financial forecasts and analyses, relating to the business, operations and prospects of Lumentum," Proxy at 97, which was prepared by Lumentum management and provided to Jefferies to use in connection with the preparation of its fairness opinion.  Such information was unquestionably material to Oclaro stockholders in light of the fact that: (a) part of the Merger Consideration was in the form of Lumentum stock; (b) the Proxy touted "Lumentum's future prospects and opportunities for long-term growth" as a reason why Oclaro stockholders should support the Merger, Proxy at 94; and (c) Jefferies prepared a valuation analysis and summary thereof concerning Lumentum in support of its fairness opinion. Accordingly, the omission of this material information renders the corresponding statements in the Proxy discussing, relying upon, and/or utilizing the Lumentum Forecasts misleadingly incomplete.

thereby, including the Merger, are advisable, fair to, and in the best interests of, Oclaro and Oclaro stockholders." E.g. Proxy at 96; 15; 71; 91; 129.

106. Perhaps nothing is more relevant for making a merger decision than the earnings picture of the acquiring company, at least to a stockholder of the company being acquired. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed; the others were concealed.

107. Indeed, in deciding to approve the Merger Agreement and recommend that Oclaro stockholders vote their shares in favor of the Merger, the Proxy includes information and financial projections concerning Lumentum and the combined company among the positive *Reasons for the Merger*:

> Participation in Potential Upside. The fact that, since a portion of the Merger Consideration will be paid in Lumentum common stock, Oclaro stockholders will benefit from an approximately 16% pro forma continuing equity ownership in Lumentum. As a result, Oclaro stockholders will have the **opportunity to participate in any future earnings or growth of the combined company and future appreciation in the value of Lumentum common stock** following the Merger should they determine to retain the Lumentum common stock payable in the Merger, including as a result of achieving the benefits to the combined company that could result from the Merger, such as breadth, market diversification and scale.

> […]

> Lumentum's Business and Oclaro's Due Diligence Review.  The Oclaro Board considered the information provided by, and discussions with, Oclaro's management regarding **Lumentum's business, results of operations and financial and market position**, and Oclaro management's expectations concerning ***Lumentum's future prospects and opportunities for long-term growth***, including opportunities that might be available to the combined company that would likely not be available to Oclaro as an independent company.  The Oclaro Board also considered the results of the due diligence investigation that Oclaro's senior management conducted with the assistance of its advisors on Lumentum.

**Strength of the Combined Company.** The projected financial strength of the combined company and its ability to fund required investments to retain leadership in the optical networking industry.

*Id.* at 91-94 (emphasis added).

108.    Moreover, the Proxy explicitly concedes the materiality of this information: "The foregoing discussion of the information and factors considered by the Oclaro Board is not exhaustive, but Oclaro believes it includes all the material factors considered by the Oclaro Board." Proxy at 96. Once the Proxy purported to disclose the factors the Board considered there was an obligation to portray them fully and fairly. Thus, by omitting the Lumentum Forecasts, the Proxy renders the above statements misleadingly incomplete.

109.    Furthermore, the *Opinion of Oclaro's Financial Advisor* section of the Proxy also discusses the Lumentum Forecasts, which were provided to Jefferies to use in connection with the preparation of its fairness opinion and the valuation analyses in support thereof.

110.    Indeed, in connection with its fairness opinion, Jefferies prepared a comparable companies analysis, in which Jefferies selected six publicly traded optical components and subsystems segment companies and evaluated each company's multiples of estimated CY 2018E Adjusted EPS and CY 2019E Adjusted EPS.  *See* Proxy at 103.  Jefferies then compared Lumentum's CY 2018E Adjusted EPS and CY 2019E Adjusted EP multiples, ***which were based on the Lumentum Forecasts***, to three of the comparable companies.[36]  *See id.* Yet, the Lumentum Forecasts themselves are withheld from the Proxy rendering the summary of the above analysis misleadingly incomplete.

111.    Despite the fact that the Merger Consideration was partially comprised of Lumentum stock and that Jefferies prepared the fairness opinion and the valuation analyses in support thereof—which was then presented to Oclaro stockholders as evidence of the Merger

[36]    Despite selecting six companies that were comparable to Lumentum, Jefferies excluded the multiples for "Acacia Communications, Inc., EMCORE Corporation and NeoPhotonics Corporation because they were greater than 30.0x or below zero and were considered not meaningful." Proxy at 103.

32

Consideration's "fairness"—using the Lumentum Forecasts, the Individual Defendants selectively excised the Lumentum Forecasts from the Proxy.

112.    By disclosing that the Lumentum Forecasts—which depicted "Lumentum's future prospects and opportunities for long-term growth," Proxy at 94—were one of the material factors that the Board considered when determining the terms of the Merger were fair and in the best interests of Oclaro's stockholders, and the Lumentum Forecasts being a fundamental input underlying the valuation analysis prepared in support of Jefferies' fairness opinion—which the Board further relied upon when deciding to enter into the Merger Agreement—Defendants obligated themselves to provide **complete and accurate disclosures** *concerning Lumentum*.

113.    In sum, the Lumentum Forecasts were reviewed and considered by the Board when assessing the fairness of the Merger Consideration and reaching the determination that the Merger was in the best interests of Oclaro and its stockholders, in addition to being reviewed, analyzed, and utilized by Jefferies when preparing its fairness opinion and the valuation analyses, which were then touted to Oclaro stockholders as evidence of the "fairness" of the Merger Consideration, but, concerningly, entirely withheld from the Proxy.  Accordingly, by withholding the Lumentum Forecasts, Defendants elected to disclose half-truths, in violation of the Exchange Act.

## III.    The Conflicted Individual Defendants, Oclaro Management, and Jefferies Each Had Personal Financial Reasons for Supporting the Unfair Merger

114.    Oclaro's directors and management faced personal conflicts of interest that motivated them to support the unfair Merger.

115.    Indeed, the 7 non-employee members of the Board stood to and did receive significant consideration—primarily comprised of cash—for their previously illiquid outstanding stock options, RSUs, PSUs, and restricted stock awards, as illustrated below:

33

| Name | Oclaro Stock Options (#)(1) | Oclaro RSUs (#) | Oclaro PSUs (#)(2) | Oclaro Restricted Stock Awards (#)(3) | Total Consideration in respect of Equity Awards ($) |
|---|---|---|---|---|---|
| Greg Dougherty | 31,560 | 331,326 | 432,150 | — | $ 7,807,707 |
| Pete Mangan | 15,000 | 161,235 | 206,235 | — | $ 3,790,275 |
| Yves LeMaitre | 23,200 | 151,235 | 191,235 | — | $ 3,434,785 |
| David Teichmann | 85,000 | 120,298 | 148,735 | — | $ 3,347,570 |
| Adam Carter | 100,000 | 107,905 | 115,405 | — | $ 3,067,333 |
| Craig Cocchi | — | 130,000 | 120,000 | — | $ 2,502,500 |
| Walter Jankovic | — | 160,000 | — | — | $ 1,601,600 |
| Thomas Gordon Beck Mason | — | 109,575 | 99,575 | — | $ 2,093,592 |
| Lisa Paul | 60,000 | 94,155 | 102,905 | — | $ 2,455,571 |
| Marissa Peterson | 17,046 | — | — | 18,762 | $ 296,385 |
| Edward Collins | 35,779 | — | — | 18,762 | $ 369,358 |
| Kendall Cowan | — | — | — | 18,762 | $ 187,808 |
| Denise Haylor | — | — | — | 13,346 | $ 133,593 |
| Ian Small | — | — | — | 42,153 | $ 421,952 |
| William L. Smith | — | — | — | 18,762 | $ 187,808 |
| Joel A. Smith III | 31,560 | — | — | 18,762 | $ 353,120 |

(1)  All stock options are fully vested with the exception of (a) 521 unvested stock options held by David Teichmann, (b) 8,334 unvested stock options held by Adam Carter and (c) 10,000 unvested stock options held by Lisa Paul.

(2)  In connection with the Merger, the Oclaro Board determined that the Oclaro PSUs granted to Oclaro's executive officers in August 2017 will be converted, contingent upon the occurrence of the Effective Time, into time-based awards vesting through August 2020, with the underlying performance milestones deemed achieved based on the maximum level of achievement (150% of target). The amounts in this column reflect the number of PSUs at 150% of target.

(3)  All outstanding Oclaro restricted stock awards held by non-employee directors of Oclaro will vest in full on the Effective Time in accordance with their terms and conditions.

116.    Additionally, in the event the Company's named executive officers were terminated upon the consummation of the Merger, they stood to receive significant "change in control" payments, as set forth in the tables below:

34

**Golden Parachute Compensation**

| Name (1) | Cash ($)(2) | Equity ($) (3) | Perquisites/ Benefits ($) (4) | Total ($) |
|---|---|---|---|---|
| Greg Dougherty | 2,400,000 | 7,642,395 | 144,000 | 10,186,395 |
| Pete Mangan | 757,750 | 3,678,374 | 72,000 | 4,508,124 |
| Yves LeMaitre | 757,750 | 3,428,124 | 72,000 | 4,257,874 |
| David Teichmann | 706,380 | 2,697,308 | 72,000 | 3,475,688 |
| Adam Carter | 646,904 | 2,304,672 | 72,000 | 3,023,576 |

(1)  Jim Haynes, who was a named executive officer for fiscal year 2017, retired on March 31, 2018, at which time his then-outstanding equity awards were forfeited. He received no change in control benefits in connection with his retirement.

(2)  The estimated amounts listed in this column represent the "double-trigger" cash severance payments that Oclaro's named executive officers would be entitled to receive in connection with a qualifying termination of employment, assuming such termination occurred at or immediately following the Effective Time. For additional information regarding these amounts, see the section titled "—Interests of Oclaro's Directors and Executive Officers in the Merger" beginning on page 108 of this proxy statement/prospectus.

| Name | Base Salary Severance ($) | Non-Equity Incentive Compensation Severance ($) | Total ($) |
|---|---|---|---|
| Greg Dougherty | 1,200,000 | 1,200,000 | 2,400,000 |
| Pete Mangan | 525,000 | 232,750 | 757,750 |
| Yves LeMaitre | 525,000 | 232,750 | 757,750 |
| David Teichmann | 495,000 | 211,380 | 706,380 |
| Adam Carter | 450,000 | 196,904 | 646,904 |

(3)  The estimated amounts listed in this column represent the estimated aggregate value that Oclaro's named executive officers would be entitled to receive in connection with the "double trigger" acceleration of their outstanding and unvested equity awards, assuming such named executive officers incurred a qualifying termination of employment at or immediately following the Effective Time, as set forth in more detail below. For additional information regarding the named executive officers' rights to accelerated vesting of outstanding equity awards, see the section titled "—Interests of Oclaro's Directors and Executive Officers in the Merger" beginning on page 108 of this proxy statement/prospectus.

| Name | Aggregate Value of Unvested Oclaro Options ($) | Aggregate Value of Unvested Oclaro RSUs ($) | Aggregate Value of Unvested Oclaro PSUs ($) | Total ($) |
|---|---|---|---|---|
| Greg Dougherty | — | 3,316,573 | 4,325,822 | 7,642,395 |
| Pete Mangan | — | 1,613,962 | 2,064,412 | 3,678,374 |
| Yves LeMaitre | — | 1,513,862 | 1,914,262 | 3,428,124 |
| David Teichmann | 4,288 | 1,204,183 | 1,488,837 | 2,697,308 |
| Adam Carter | 69,339 | 1,080,129 | 1,155,204 | 2,304,672 |

(4)  The estimated amounts listed in this column represent "double trigger" lump sum cash payments that may but are not required to be used for continuing other benefits, such as health and welfare benefits, and that Oclaro's named executive officers would be entitled to receive in connection with a qualifying termination of employment, assuming such termination occurred at or immediately following the Effective Time. For additional information regarding these amounts, see the section titled "—Interests of Oclaro's Directors and Executive Officers in the Merger" beginning on page 108 of this proxy statement/prospectus.

117.    Additionally, Jefferies faced a significant conflict of interests, which plagued its ability to render an independent and unbiased "fairness" opinion.  As a leading scholar on the issue explained in one of the most thorough analyses of the issues that plague the fairness opinion process:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…*conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit*

35

1
2
3
4

> *from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.*

5
6
7
8
9

> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction. This will ensure future lucrative business.

10
11

Steven M. Davidoff, Fairness Opinions, 55 AM. U.L. REV. 1557 (August 2006) (emphasis added).

12
13
14
15

118. Here, the Company agreed to pay Jefferies an estimated fee of approximately $30.1 million, of which $1 million became payable to Jefferies at the time Jefferies delivered its opinion and a substantial portion—**approximately 97%**—of which was contingent and payable upon the consummation of the Merger.

16
17
18

119. In other words, the Defendants, Oclaro management, and Jefferies all faced significant conflicts of interest and had significant personal financial reasons for supporting the Merger despite the inadequacy of the Merger Consideration to the Company's stockholders.

19
20
21
22
23
24
25

120. In sum, the Proxy was materially misleading with respect to three categories of material information—that the January Projections and February Projections were prepared on a *reasonable basis*, reflecting the best currently available estimates and *good faith* judgments of Oclaro management as to the future financial performance of Oclaro, the January Projections and the February Projections, and the implied equity reference ranges per share calculated by Jefferies—and further rendered misleadingly incomplete by entirely omitting the material Lumentum Forecasts.

26
27

121. If a Proxy discloses valuation information, it must be **complete and accurate**. With regard to future events, projections, and other metrics regarding future valuation, a company

28

1    may choose silence or speech elaborated by the factual basis as then known--but it may not choose

2    half-truths.

3           122.    Here, Defendants materially misled Oclaro stockholders as to the true value of their

4    interest in the Company by declaring the January Projections and the February Projections were

5    prepared on a "reasonable basis" and in "good faith" and then directing Jefferies to review the

6    Oclaro Projections but only prepare valuation analyses with the February Projections in support of

7    its fairness opinion.  The Proxy further failed to disclose material information by withholding the

8    Lumentum Forecasts, which would have alerted Oclaro stockholders that the Merger failed to

9    fairly value their interest in the Company.  Defendants, by electing to misled stockholders and

10   disclose certain, cherry-picked valuation information and projections, assumed an obligation to

11   provide Oclaro stockholders with complete and accurate disclosures concerning the above-

12   referenced material information.  Defendants' failure to do so rendered the Proxy materially

13   misleading in violation of Section 14(a)/Rule 14a-9.

14          123.    The materially misleading Proxy was an essential link in consummating the unfair

15   Merger, which caused Plaintiff and the Class to suffer financial loss in that they received less than

16   fair value for their Oclaro shares.

17          124.    By misrepresenting the true financial prospects of Oclaro and withholding the

18   expected financial outlook of Lumentum, Company stockholders were forced to blindly rely on

19   the implied equity reference range per share for Oclaro that were calculated by Jefferies and unable

20   to realize that the Merger Consideration undervalued the Company, thereby resulting in Plaintiff

21   and the Class being cashed out and owning a percentage of the post-Merger combined company

22   that did fairly compensate them for the true value of their interest in Oclaro.

23          125.    Accordingly, Plaintiff, on behalf of the Class, seeks to hold Defendants accountable

24   for the financial loss and damages they suffered, which were caused by Defendants' violations of

25   the Exchange Act and Rule 14a-9.

26

27

28

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
SECURITIES EXCHANGE ACT OF 1934**

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

126.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

128.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

129.    Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting Oclaro stockholders' support for the Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which misrepresented and omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially false, misleading, and incomplete because such sections provided a false, misleading, and incomplete valuation picture of Oclaro and Lumentum.  The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

130.    Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Oclaro, were aware of the omitted information but failed to ensure such information was materially complete and accurately disclosed in the Proxy, in violation of Section 14(a) and Rule 14a-9.  The Individual Defendants knew or were negligent in not knowing that the Proxy was

38

materially false, misleading, and incomplete in regard to the above-referenced material information. The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that Jefferies reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Jefferies as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the true facts concerning the process involved in selling Oclaro and Oclaro's true value, which was far greater than the Merger Consideration the Company's former stockholders received.

131. The Individual Defendants knew or were negligent in not knowing that the material information identified above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and incomplete. Indeed, the Individual Defendants were required to review Jefferies' valuation analyses, question Jefferies as to its derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. The text of the Proxy urged stockholders to "carefully read" it, yet Defendants failed to do so themselves.

132. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to misrepresent and omit material information in the Proxy or failing to notice the material misrepresentations and omissions in the Proxy upon reviewing it, which the Individual Defendants were required to do carefully. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Proxy.

133. Oclaro is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

134. Merger Sub LLC is also liable for the Individual Defendants' and Oclaro's violations of the Exchange Act as Oclaro's successor entity.

39

135.    Lumentum is also liable for the Individual Defendants' and Oclaro's violations of the Exchange Act as the successor owner of Merger Sub LLC.

136.    The above-referenced information that was mispresented and omitted in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false, misleading, and incomplete.

137.    As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete Proxy that Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.  By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

138.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

139.    The Individual Defendants acted as controlling persons of Oclaro within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Oclaro, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

140.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

40

1   shortly after these statements were issued and had the ability to prevent the issuance of the

2   statements or cause the statements to be corrected.

3       141.    In particular, each of the Individual Defendants had direct and supervisory

4   involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

5   the power to control or influence the particular transactions giving rise to the Exchange Act

6   violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous

7   recommendation of each of the Individual Defendants to approve the Merger.  They were thus

8   directly involved in preparing this document.

9       142.    In addition, as the Proxy sets forth at length, and as described herein, the Individual

10  Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

11  Proxy describes the various issues and information that the Individual Defendants reviewed and

12  considered.  The Individual Defendants participated in drafting and/or gave their input on the

13  content of those descriptions.

14      143.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

15  of the Exchange Act.

16      144.    As set forth above, the Individual Defendants had the ability to exercise control

17  over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

18  their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the

19  Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and

20  proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages

21  and actual economic losses (*i.e.,* the difference between the value they received as a result of the

22  Merger and the true value of their shares at the time of the Merger) in an amount to be determined

23  at trial.

24                          **PRAYER FOR RELIEF**

25  **WHEREFORE**, Plaintiff prays for judgment and relief as follows:

26      A.      Declaring that this action is properly maintainable as a Class Action and certifying

27  Plaintiff as Class Representative and his counsel as Class Counsel;

28

41

B.      Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED: April 15, 2019

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
        mschreiner@monteverdelaw.com

*Counsel for Lead Plaintiff*

Respectfully submitted,
*/s/ David E. Bower*
 David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
Fax: (212) 202-7880
Email:  dbower@monteverdelaw.com

*Counsel for Lead Plaintiff*

42