# EXHIBIT 1

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

SAISRAVAN BHARADWAJ KARRI,
Individually and on Behalf of All Others
Similarly Situated,

　　　　　　Plaintiff,

　　v.

OCLARO, INC., GREG DOUGHERTY,
PETE MANGAN, YVES LEMAITRE,
MARISSA PETERSON, EDWARD
COLLINS, KENDALL COWAN, DENISE
HAYLOR, IAN SMALL, BILL SMITH,
JOEL A. SMITH III, LUMENTUM
HOLDINGS INC., and PROTA MERGER,
LLC,

　　　　　　Defendant.

Civil Action No. 3:18-cv-03435-JD

**SECOND AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND BREACHES OF FIDUCIARY DUTY**

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

　　　　Lead Plaintiff SaiSravan Bharadwaj Karri ("Plaintiff"), by and through his undersigned

attorneys, alleges upon personal knowledge, with respect to himself, and upon information and

belief based upon, *inter alia*, the investigation of counsel and review of documents produced in

the ongoing discovery[1] process, as to all other allegations herein, as follows:

---

[1]  Some of the documents and facts referenced herein were produced during the ongoing discovery
process and are subject to the protective order between the parties (ECF No 67). Accordingly,
Plaintiff is moving to file this Second Amended Class Action Complaint under seal.

### NATURE OF THE ACTION

1.     Plaintiff brings this class action on behalf of himself and the other former public shareholders of Oclaro, Inc. ("Oclaro" or the "Company") against Lumentum Holdings Inc. ("Lumentum"), Prota Merger, LLC ("Merger Sub"), Oclaro, the former members of the Oclaro's board of directors (the "Board"), and certain former Oclaro executive officers (the "Officer Defendants" and together with the Board, the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"), in connection with the acquisition of Oclaro by Lumentum (the "Merger"). Plaintiff also asserts a claim against the Officer Defendants for breaching their fiduciary duties under Delaware law.

2.     On March 11, 2018, Oclaro, Lumentum, and Merger Sub entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Lumentum would acquire Oclaro in a two-step merger transaction[2] for $5.60 in cash and 0.0636 shares of Lumentum stock per share of Oclaro stock (the "Merger Consideration")—an amount severely less than the fair value of Oclaro shares.

3.     To justify the untimely and undervalued sale of Oclaro and convince its shareholders the Merger Consideration was fair, Oclaro created lowered financial projections and directed its financial advisor, Jefferies LLC ("Jefferies"), to use these lowered projections in their fairness opinion (the "Fairness Opinion Projections"). Between December 2017 and February 2018 Defendants Greg Dougherty (Oclaro's Chief Executive Officer), Pete Mangan (Oclaro's Chief Financial Officer), and Yves LeMaitre (Oclaro's Chief Strategy Officer and President of Oclaro's Optical Connectivity Business ("OCB")) completely dismantled their freshly created December Projections shortly after providing them to bidders and Jefferies. Oclaro then directed Jefferies to use the Fairness Opinion Projections to find the Merger Consideration "fair" to Oclaro shareholders. However, the Fairness Opinion Projections were neither created to model ongoing

---

[2]   First, Prota Merger Sub, Inc. would merge with and into Oclaro (the "First Step Merger") with Oclaro surviving the First Step Merger. As soon as reasonably practicable following the First Step Merger, Oclaro would merge with and into Prota Merger, LLC ("Merger Sub"), with Merger Sub continuing as the surviving entity.

operations of the Company nor were they ever shown to any potential buyers, including Lumentum. They were created solely for the purpose of Jefferies issuing a fairness opinion.

4.      On June 1, 2018, the Individual Defendants prepared, approved, and disseminated the misleading definitive proxy statement (the "Proxy") to solicit shareholder approval of the Merger. The Proxy misleadingly stated that the significantly depressed Fairness Opinion Projections "were prepared on a reasonable basis, reflecting the best currently available estimates and judgments at the time of their preparation" (Proxy at 105) and "were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of Oclaro as to the future financial performance of Oclaro." Proxy at 97. The Proxy then touted valuation ranges prepared by Jefferies utilizing the slashed Fairness Opinion Projections, which directly misled shareholders about the value of Oclaro.  Proxy at 99-103.

5.      As set forth below, the Individual Defendants knew that the Fairness Opinion Projections did not reflect "good faith" downward adjustments to the financial projections finalized on December 22, 2017 (the "December Projections," and together with the Fairness Opinion Projections, the "Oclaro Projections") and did not accurately reflect the "best currently available estimates" of Oclaro's future financial performance. Indeed, the complete absence of any substantive explanation for the substantial reduction in the compound annual growth rates ("CAGR") for Oclaro's expected Revenue, Adjusted EBITDA, Net Income, and Free Cash Flow illustrates this point. And the actual changes made to each projection metric run counter to and are refuted by contemporaneous statements made by Oclaro and the Officer Defendants leading up to the Merger.

6.      Moreover, the Officer Defendants knew, as they were repeatedly told by Jefferies, that early 2018 was an inopportune and ill-advised time to sell Oclaro. The Company was nearing a trough of performance and was due for a strong rebound and even stronger long-term success. But each of the Officer Defendants had personal and financial motivations to effectuate an immediate deal.

7.      The special meeting of Oclaro shareholders to vote on the Merger was held on July 10, 2018 (the "Shareholder Vote"). A majority of Oclaro shareholders cast uninformed votes to

approve the Merger, and on December 10, 2018, the Merger was completed. The materially false and misleading Proxy was an essential link in the consummation of the Merger, as the Shareholder Vote and resulting Merger could not have occurred without the dissemination of the Proxy.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 and claims against the Officer Defendants for breach of fiduciary duty. Plaintiff seeks to recover damages resulting from the Defendants' violations of law.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.     The Court has supplemental jurisdiction over the state law claim for breach of fiduciary duties pursuant to 28 U.S.C. § 1367.

11.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Oclaro maintained its primary place of business in this District; (iii) Lumentum maintains its primary place of business in this District; (iv) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

**PARTIES**

13.     Plaintiff was, at all relevant times, a common shareholder of Oclaro.

14.     Defendant Oclaro was a Delaware corporation and maintained its principal executive offices at 225 Charcot Avenue, San Jose, California 95131.  As a result of the Merger, Oclaro ceased to exist.

15.     Defendant Greg Dougherty ("Dougherty") was, at all relevant times, a director of Oclaro, and served as the Chief Executive Officer ("CEO") of the Company. Defendant Dougherty was previously a director of Avanex Corporation, which in 2009 merged with Bookham, Inc. to form Oclaro. Defendant Dougherty continued in his capacity as director following the business combination and served as a director of Oclaro until the closing of the Merger. Defendant Dougherty desired to step back from his CEO role at Oclaro and join the director circuit. And since the Merger, Defendant Dougherty became a director for multiple photonics companies, including Infinera Corp, MaxLinear Inc, Fabrinet, and IPG Photonics Corp. Defendant Dougherty was joined at Inferia Corp by fellow former Oclaro executive officers Craig Cocchi (former Chief Operating Officer of Oclaro) and David Teichmann (former General Counsel of Oclaro).

16.     Defendant Pete Mangan ("Mangan") was the Chief Financial Officer (CFO) of Oclaro from 2013 until the close of the Merger. Although efforts were made to secure his continued role with Lumentum permanently, Defendant Mangan wanted to retire and negotiated for a lucrative three-month transition role with Lumentum.

17.     Defendant Yves LeMaitre ("LeMaitre") was the President of Oclaro's Optical Connectivity Business, one of the two business lines of the Company, since 2013. In February 2018, Defendant LeMaitre was promoted to Chief Strategy Officer of Oclaro. Following the Merger, Defendant LeMaitre continued in his capacity as Chief Strategy Officer of Lumentum.

18.     Defendant Marissa Peterson was a director of Oclaro since July 2011 and served as the Chairman of the Board since June 2013.

19.     Defendant Edward Collins ("Collins") was director of Oclaro since the founding merger. Defendant Collins was a director of Bookham prior to the merger with Avanex to create Oclaro.

20.     Defendant Kendall Cowan ("Cowan") joined Oclaro as a director in July 2012 when Oclaro acquired Optnext where he served as a director since 2007.

21.     Defendant Denise Haylor ("Haylor") was a director of Oclaro from August 2016 until the close of the Merger. Defendant Haylor has served as a Partner and Managing Director of The Boston Consulting Group ("BCG") since April 2017. Although not mentioned in the Proxy, BCG served as a financial advisor to Oclaro during the Merger process.

22.     Defendant Ian Small ("Small") was appointed as a director of Oclaro in September 2017. Defendant Small served as a member of the Board until the close of the Merger. Defendant Small continues to serve as a director of Lumentum.

23.     Defendant Bill Smith joined Oclaro as a director in July 2012 when Oclaro acquired Optnext where he served as a director since 2009.

24.     Defendant Joel A. Smith III was a director of Oclaro since April 2009 and served as lead independent director of Oclaro between July 2011 and June 2013. Similar to Defendant Dougherty, Defendant Joel A. Smith was as a director of Avanex Corporation, and continued in his role as a director when Avanex and Bookham merged to create Oclaro.

25.     The defendants identified in paragraphs 14 through 24 are collectively referred to herein as the "Oclaro Defendants."

26.     The defendants identified in paragraphs 15 through 24 are collectively referred to herein as the "Individual Defendants."

27.     The defendants identified in paragraphs 15 through 17 are collectively referred to herein as the "Officer Defendants."

28.     The defendants identified in paragraphs 15 and 18 through 24 are collectively referred to herein as the "Board."

29.     Defendant Lumentum is a Delaware corporation and maintains its principal executive offices at 400 North McCarthy Boulevard, Milpitas, California 95035.  As a result of the Merger Oclaro merged with and into Merger Sub, Merger Sub survived as a direct wholly owned subsidiary of Lumentum, and Oclaro ceased to exist. Accordingly, Lumentum is named in its capacity as a surviving entity of the Merger and Oclaro's successor in interest.

30.     Defendant Merger Sub is a Delaware limited liability company, maintains its principal executive offices at 400 North McCarthy Boulevard, Milpitas, California 95035, and is a direct wholly owned subsidiary of Lumentum.  Merger Sub was formed on March 9, 2018, for the sole purpose of effecting the Merger.  Following the Merger, Oclaro merged with and into Merger Sub, with Merger Sub surviving as a direct wholly owned subsidiary of Lumentum. Accordingly, Merger Sub is named in its capacity as a surviving entity of the Merger and Oclaro's successor in interest.

31.     Merger Sub, together with Oclaro, Lumentum, and the Individual Defendants, are collectively referred to herein as the "Defendants."

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.    Background of Oclaro and the Events Leading Up to the Merger

32.     Oclaro was a leading provider of optical components and modules for the long-haul, metro, and data center markets with two main business lines: their Optical Connectivity Business ("OCB") and their Integrated Photonics Business ("IPB"). The Company specialized in indium phosphide laser modulator and photodetector technology, which places it at the top of the line for production quality, especially for higher bandwidth communication. Oclaro also maintained a particularly strong balance sheet with zero debt and over $300 million in excess cash and traded at a lower multiple than its competitors. Given the development in the datacenter business, where cloud-based companies are constantly adding and upgrading to higher bandwidths, and the rise in prominence of 5G communications, Oclaro was well-positioned in a sector that was poised for considerable long-term growth.

33.     Beginning in 2016, Oclaro initiated a plan to turn around the Company and maximize shareholder value. From 2016-2017, Oclaro produced spectacular results and built its business, both financially and technologically, for strong long-term growth.

34.     On November 1, 2016, the Company announced its financial results for the First Quarter fiscal year ("FY") 2017.  Notably, the Company increased revenue by 54.8% year-over-

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

year and exceeded their guidance for both revenue and operating income.[3] Defendant Dougherty commented on the results:

> I'm pleased to say that we started our first quarter of fiscal year 2017 the same way we ended fiscal '16, with a record quarter.  Once again, the Oclaro team delivered the best gross margin and operating income performance in our history, and exceeded our guidance in all areas.
>
> …
>
> Our technology leadership in optical components and modules for bandwidth at 100 gigabits and beyond has us well-positioned to continue to deliver solid growth in both markets.  Our strong revenue results underpin the highest gross margin and operating income in the history of Oclaro…
>
> In addition to producing these excellent results, we continue to strengthen our balance sheet.  Early in the quarter, we retired $65 million of convertible debt followed by a very successful capital raise in September.  By taking these actions we ended the quarter with $229 million of cash and essentially no debt.  These resources will enable us to continue to invest to be the market leader in optics for 100 gigabits and beyond.[4]

35.     Defendant Mangan further commented on the Company's outstanding performance and, more importantly, the Company's projected future performance, stating "we currently expect revenues to grow in the quarter by approximately 8% to 14% and we'll be in the range of 146 million to 154 million." *Id.*

36.     In response to the Company's strong performance, investment bank Piper Jaffray Companies ("Piper Jaffray") raised its price target for Oclaro common stock to $13 from $9.50 a share (over the Company's closing stock price of $7.34 on November 1, 2016).[5]  Piper Jaffray's analyst referred to the Company's "outstanding" Q1 results when explaining his more favorable outlook for the Company.

---

[3]   Oclaro, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Press release issued by the Company on November 1, 2016) (Nov. 1, 2016).

[4]   *Oclaro's (OCLR) CEO Greg Dougherty on Q1 2017 Results - Earnings Call Transcript*, Seeking Alpha (Nov. 1, 2016), *available at* https://seekingalpha.com/article/4017992-oclaros-oclr-ceo-greg-dougherty-q1-2017-results-earnings-call-transcript.

[5]   Oclaro: Piper is bullish following Q1 blowout results, Seeking Alpha (Nov. 2, 2016), *available at* https://seekingalpha.com/news/3219695-oclaro-piper-bullish-following-q1-blowout-results.

37.     On January 31, 2017, the Company announced its Second Quarter 2017 financial results where they improved every metric from the record first quarter, produced $154 million in revenue—the very top end of their guidance—and exceeded the top end of their guidance on operating income by 40%. Defendant Dougherty explained best:

> Our December quarter was very strong with improvement in all our financial metrics. Revenue increased 14 percent from the first quarter of fiscal 2017, and 64 percent from the same quarter last year, with demand for our newer 100G and beyond products driving this excellent growth. In addition, we had record gross margin and operating income resulting from higher revenue, a richer product mix, and favorable foreign exchange rates. We currently forecast revenue to increase again in the March quarter, driven by healthy demand across the multiple markets we serve.[6]

38.     Financial analysts and market commentators were all impressed with Oclaro's growth and continued success.

39.     For example, on February 1, 2017, Piper Jaffray raised its price target *again*, this time from $13 to $15.[7] Once again, Piper Jaffray's analyst commented on his improved outlook for the Company:

> Oclaro reported FQ2 results in-line with the company's positive preannouncement, and provided upbeat FQ3 guidance, with revenues, gross margin and operating income all coming in ahead of consensus expectations. Following these strong results, we believe Oclaro remains one of the best positioned optical companies to see this momentum continue throughout 2017, and believe sustained strength in China and ramping US Metro and Datacom orders represent three meaningful catalysts over the next several quarters. While we took our estimates higher, *we believe upside still exists to this forecast due to OCLR's CFP2-ACO leadership, as well as management's history of providing conservative guidance*.

*Id.* (emphasis added). On February 1, 2017, Oclaro common stock closed at $9.45 per share. As a result, Piper Jaffray's revised price target now implied an approximate 60% premium to the Company's common stock price.

---

[6]     *Oclaro Announces Second Quarter Fiscal Year 2017 Financial Results*, Seeking Alpha (Jan. 31, 2017), *available at* https://seekingalpha.com/pr/16728849-oclaro-announces-second-quarter-fiscal-year-2017-financial-results.

[7]     *Oclaro (OCLR) PT Raised to $15 at Piper Jaffray*, Street Insider (Feb. 1, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Oclaro+%28OCLR%29+PT+Raised+to+%2415+at+Piper+Jaffray/12484903.html.

40.     David Zanoni, one of the top analysts for the investor website Seeking Alpha, asserted that Oclaro stock was poised to outperform its current price in light of the strong demand for its products and strong growth.[8]  Mr. Zanoni noted that "Oclaro expects to grow revenue by 25% to 30% in 2017.  Consensus estimates show that Oclaro is expected to average about 26% annual revenue growth through 2019.  I expect the stock to continue to run higher and outperform as revenue continues to grow at above average rates."  In closing, Mr. Zanoni stated that Oclaro's "strong continued product demand will drive above average sales growth for the next 2 to 3 years.  This is a recipe for the stock to achieve gains that exceed its peers and the S&P 500 for the foreseeable future." *Id.*

41.     The next month, on March 15, 2017, Needham & Company maintained its *Strong Buy* recommendation at $14 price target for Oclaro stock.[9]  Needham's analyst stated that Oclaro shares are an "exceptional value."  *Id.*  Oclaro's stock closed at $8.73 on March 15, 2017.

42.     On May 2, 2017, Oclaro announced another set of record financial results for the Third Quarter of Fiscal Year 2017. Oclaro once again achieved the top end of their guidance growing revenue 5% quarter to quarter and 60% year to year and exceeded their guidance for operating income.

43.     Particularly noteworthy was the Company's success in the 100-gig and beyond product portfolio.  As Defendant Mangan noted, Oclaro's sales of 100-gig and beyond products "reached $125.8 million driven by our newer line side and client-side products, and increased 11% from last quarter and 115% from the same period 1 year ago."[10]

---

[8]    *Oclaro: Stock To Outperform On Low Valuation And High Growth*, Seeking Alpha (Feb. 10, 2017), *available at*  https://seekingalpha.com/article/4044924-oclaro-stock-outperform-low-valuation-high-growth.

[9]    *Needham & Company Reiterates Strong Buy Rating and $14 PT on Oclaro (OCLR); 'Shares are an Exceptional Value'*, Street Insider (March 15, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Needham+%26+Company+Reiterates+Strong+Buy+Rating+and+%2414+PT+on+Oclaro+%28OCLR%29%3B+Shares+are+an+Exceptional+Value/12669284.html.

[10]    *Oclaro's (OCLR) CEO Greg Dougherty on Q3 2017 Results - Earnings Call Transcript*, Seeking Alpha (May 2, 2017), *available at* https://seekingalpha.com/article/4068225-oclaros-oclr-ceo-greg-dougherty-q3-2017-results-earnings-call-transcript.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

44.   Defendant Dougherty further explained the importance of the Company's success with its 100-gig and beyond products:

> We again posted record results and showed growth in all areas of our business in what is otherwise considered a seasonally weak quarter. . . . Our results reflect the continuing strength of our 100-gig and beyond product portfolio, which grew to $126 million in sales and represented 78% of our total revenue for the quarter.
>
> …
>
> The good news is that we believe the fundamental demand drivers in China remain intact. And we anticipate growth from the region to return again later this year from metro and provincial networks deployment. Another future growth driver for China will be the deployment of 5G wireless technology. *China is driving to be the first country to deploy 5G and is targeting 2019 to do so…We believe that **we are uniquely positioned to be successful in this new very large emerging market**.*
>
> …
>
> As we look at the evolution of optics within the data center, we see a strong push for higher speeds. At OFC, we demonstrated our 400 gig data center product. We are currently shipping our CFP8 PAM4 transceiver and developing next generation 400 gig PAM4 small form factor solutions such as the QSFP56 double density and the OSFP. These products are all enabled by our industry leading 56 gig in laser technology. **Higher and higher speeds play very well to Oclaro's strength and we expect to be a leader in 400 gig optic. *Despite the near-term headwinds*, given our technology leadership in 100 gig and beyond, we remain bullish about the prospects for future growth in the markets that we serve.** We currently expect to show a revenue growth again in the September quarter. And as a result, we project that our sales for calendar year 2017 will grow by approximately 20% compared to 2016.

*Id.* (emphasis added).

45.   Despite the glimpse of potential negative market conditions in China, analysts remained optimistic on Oclaro's outlook. Indeed, on May 3, 2017, nine Wall Street analysts issued price targets for Oclaro of $10.50 - $14.

46.   On June 19, 2017, financial analyst Ophir Gottlieb authored an in-depth analysis of the Company, highlighting its recent growth and potential for substantial future growth. To start, Mr. Gottlieb noted that "[d]emand for bandwidth and low latency in the core network continues to explode, with video services, cloud computing, voice over IP and social media driving more network traffic."[11] Indeed, traffic growth on mobile alone is expected to increase 1,000% in 6

---

[11] *Oclaro Has An Opportunity In The Data And Speed Revolution*, Seeking Alpha (June 19, 2017), *available at* https://seekingalpha.com/article/4082219-oclaro-opportunity-data-speed-

years. Accordingly, companies that are capable of providing higher speed data and telecom are poised to be "winners." *Id.*

47.    Mr. Gottlieb then discussed the growth cycle market drivers that Oclaro identified and anticipated would facilitate substantial growth to the Company's core products.

48.    For example, Oclaro expected its total addressable market ("TAM") to grow at 47% CAGR through 2020, taking a $150 million market to over $1 billion, as illustrated below:



*Id.* The seven-fold growth gave reason for investors to be bullish.

49.    Similarly, the 100G market was expected to see TAM growing at 24% CAGR, thereby growing a $400 million market to over $2 billion by 2020, or a five-fold rise. *Id.*

50.    With respect to the Company, Mr. Gottlieb noted that "[w]e can see across the speed spectrum that Oclaro has products in production and development to satisfy the bursting needs for speed and data handling." *Id.* Mr. Gottlieb also highlighted the Company's financials, in particular that "[r]evenue (TTM) has increased for *seven consecutive quarters*, which triggers a

revolution.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

'trend.' It has now reached $577 million, compared to last year when it was $365 million, which is a 58.1% 1-year change." Similarly, "[g]ross margin % for Oclaro is 37.1%, up from 25.2% last year, which is a 47% 1-year rise. When dealing with companies that have hardware and services, we pay special attention to gross margins. If the measure is decreasing, we're looking at a company with weakening pricing strength - that means competition is coming. **With Oclaro, we see the opposite**." *Id.* (emphasis added).

51.    On July 7, 2017, Stifel Financial Corporation raised its price target for Oclaro common stock to $12 and maintained a *Buy* rating.

52.    Also on July 7, 2017, Shareholders Unite published a similar, in-depth analysis of the Company, which further demonstrated that "Oclaro is undervalued."[12]

53.    Indeed, just as Mr. Gottlieb acknowledged, Shareholders Unite further pointed out that "that demand is booming for higher end datacom products (100G+)," which was one of the segments that Oclaro thrived in. Indeed, 100G+ happened to be Oclaro's (OCLR) main source of revenue, as Defendant Dougherty stated in the Q3 2017 Results - Earnings Call:

> Our results reflect the continuing strength of our 100-gig and beyond product portfolio, which grew to $126 million in sales and represented 78% of our total revenue for the quarter. This growth was fueled by shipments of our market leading CFP2-ACO and our emerging QSFP28 product family into the metro and data center markets."

54.    Shareholders Unite then discussed the Company's future outlook, noting that it had become less reliant on its Chinese consumers and diversified its consumer base. *Id.* Furthermore, Oclaro's financials indicated that the company "is strong…and has a ***history of beating expectations***." *Id.* (emphasis added).

55.    On August 2, 2017, the Company reported its Fourth Quarter and Fiscal Year 2017 financial results, again reporting revenue at the upper end of their guidance and exceeding their guidance for operating income. Defendant Dougherty summarized the Company's incredible performance, stating "I am incredibly proud of what the Oclaro team accomplished during the past year. We posted year-over-year revenue growth of 47 percent, while also delivering significantly

---

[12] *Oclaro Is Undervalued*, Seeking Alpha (July 7, 2017), *available at* https://seekingalpha.com/article/4086381-oclaro-undervalued.

higher profits. Our excellent results were driven by the strength of our 100G and beyond product portfolio whose revenue doubled over fiscal year 2016."[13]

56. Defendant Dougherty concluded the Company's Fourth Quarter and Fiscal Year 2017 earnings call[14] by stating:

> [F]iscal year 2017 was a remarkable year for Oclaro. . . . These tremendous results were *driven by our 100 gig and beyond* product portfolio, which doubled in revenue over 2016 . . . During the fourth quarter, our QSFP28 and CFP2-ACO fueled solid revenue of $149 million. This revenue was achieved despite an $11 million sequential decline in China sales . . . As we projected, our QSFP28 sales in the quarter doubled compared to Q3. Together the QSFP28 and ACO product families accounted for over 40% of our total sales. We expect that the *demand for both product lines will continue to be strong through fiscal year 2018 driven by the continued growth in the metro and data center market*. Our 100 gig and beyond sales were $121 million in Q4 and represented 81% of our total sales.
>
> . . .
>
> Moving from revenue, **we remain bullish about our business model**. We believe that we will be able to maintain our gross margins in the high 30s below 40 percentage range. . . . To summarize, we had an outstanding fiscal year 2017, our position in the data center and metro market looks very good. With highly differentiated products and a new product pipeline that will offer us exciting opportunities in the future. We have also further diversified our customer and geographical mix. **We are well positioned for our new year as we commence it with strong set of 100 gig and beyond product, which are ramping well**. Our strong customer market positions, plus a ***very strong financial model*** give us very many reasons to be optimistic . . . **We remain very optimistic about our future**.

57. Once again, Wall Street analysts remained very bullish on Oclaro's outlook. Indeed, on May 3, 2017, eleven analysts issued price targets for Oclaro of $11.75 - $14.

58. On September 15, 2017, Raymond James issued a *Strong Buy* and $12 price target for Oclaro common stock, implying a 36.8% upside from the stock's closing price of $9.07.

59. In sum, prior to Lumentum inserting itself into the sales process, Oclaro was a successful company well-positioned for an even brighter future. The Company continuously achieved tremendous financial accomplishments, repeatedly exceeded its own financial

---

[13] *Oclaro Announces Fourth Quarter and Fiscal Year 2017 Financial Results*, Seeking Alpha (Aug. 2, 2017), *available at* https://seekingalpha.com/pr/16904915-oclaro-announces-fourth-quarter-fiscal-year-2017-financial-results.

[14] Oclaro's (OCLR) CEO Greg Dougherty on Q4 2017 Results - Earnings Call Transcript, Seeking Alpha (Aug. 3, 2017), *available at* https://seekingalpha.com/article/4094108-oclaros-oclr-ceo-greg-dougherty-q4-2017-results-earnings-call-transcript.

expectations, and touted its promising future financial performance. Financial analysts also issued optimistic commentary and price targets for Oclaro. In other words, Oclaro was a thriving Company advantageously positioned to capitalize on growing markets (*e.g.,* the 5G wireless market and 100G+ market), which would ensure the Company's continued success for the foreseeable future.

60.     On November 1, 2017, Oclaro reported "strong quarterly results" for First Quarter Fiscal Year 2018 meeting the upper end of its revenue guidance, exceeding its operating income guidance, and generating "sequential revenue growth and strong profitability."[15] But the market ignored Oclaro's success in the quarter and focused on the softness in the Chinese market, even though the Company was diversifying its geographical customer base and growing rapidly in other areas. It is important to note—as Defendant Dougherty did multiple times in the Q1 2018 Earnings call—that the softness in China was a temporary slowdown and would not be a driving factor on the long-term outlook of Oclaro:

> **We currently believe that revenue growth will resume during the second half of calendar 2018** *driven by a 100 gig and beyond* coherent products, our QSP28 and our industrial temperate range 25 gigs transceivers used in 5G applications . . . Despite our reduced revenue guide for Q2 *we continue to believe* that the fundamental demand *growth drivers* for fiber optic modules and components *remain intact*. We still see bandwidth demand coming from preparations for 5G networks, new architectures for MSOs in the metro access space and the continued shift in data centers for 100 gigs . . . *we remain very confident in our business model* and are excited by our products roadmap. While we see the **market slowness as short-term phenomena** we're committed to maintaining strong financials as we move forward. We believe that we'll be able to maintain our gross margins in the high 30s to 40% and deliver operating income in the teens.

61.     In the face of this temporary, industry-wide downturn, Lumentum emerged eager to pounce on an undervalued Oclaro. Lumentum obviously recognized (as did their bankers and all other industry experts) that the Chinese market issue was a temporary, near-term headwind that no one expected to continue, and sought to acquire Oclaro on the cheap. As set forth below, the

---

[15] *Oclaro Announces First Quarter Fiscal Year 2018 Financial Results*, Seeking Alpha (Nov. 1, 2017), *available at* https://seekingalpha.com/pr/16987887-oclaro-announces-first-quarter-fiscal-year-2018-financial-results.

Individual Defendants acquiesced and facilitated a sale to Lumentum at a price well below the fair value of Oclaro.

62.     Contrary to the Proxy, Lumentum and their advisors reached out to Oclaro *prior* to the November 8, 2017 meeting between Defendant Dougherty and Lumentum CEO Alan Lowe. In fact, Lumentum set its sights on acquiring Oclaro just prior to its Q1 2018 earnings announcement. As direct competitors in the optical industry with a thorough understanding of both Oclaro's business lines and the marketplace, Lumentum and its financial advisor, Deutsche Bank, undoubtedly knew about the temporary softness in the Chinese market, the short-term earnings' impact that Oclaro was about to announce, and the artificial depression it would cause on Oclaro's stock price. This sequencing and temporary stock depression is important for several reasons. First, as explained in greater detail below, it would produce a period of very difficult work for a Company whose senior executives were interested in retirement. Second, if complications arose that lasted for a quarter or two longer than expected, it could lead to loss of equity awards or the possibility of Company management being fired for cause,[16] forfeiting millions of dollars in unvested equity (as elaborated on below). Third, with consolidation ongoing in the industry, Oclaro's temporarily lower stock price would prevent it from making attractive offers to acquire other companies, like ████████, since any deal would require a stock component. Fourth, and similarly, the industry wide nature of the downturn would prevent other parties, like Inphi, from being able to offer superior proposals during the same time period. Fifth, Oclaro's depressed stock price meant that Lumentum could easily offer an illusory "premium" to the Company's trading price, while still receiving a discount to the Company's true value.

63.     Similar to Oclaro, Lumentum is a provider of optical and photonic products addressing a range of end market applications including data communications and telecommunications networking and commercial lasers for manufacturing, inspection, and life-science applications. However, Lumentum was over three times the size of Oclaro, was willing to

---

[16] On October 5, 2017, Defendant Dougherty expressed surprise that competitor and acquisition target, ████████, had not fired their CEO after their recent poor financial results.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

take on more debt than Oclaro, and thus could offer a much more sizable portion of cash consideration in any merger bid than Oclaro (or Inphi).

64.    During the last week of October 2017, Defendant Dougherty and a representative of Lumentum met to discuss an "opportunity." And on November 3, 2017, two days after Oclaro announced its strong first quarter, but gave lower guidance for the near future—causing the price of Oclaro stock to drop nearly 30%—representatives of Deutsche Bank emailed Defendant Dougherty to "reconnect." Three days later, on November 6, 2017, Oclaro formed an M&A Committee to oversee the sales process, despite knowing (and being advised by Jefferies) that it was a bad time to sell the Company.

65.    On the morning of November 8, 2017, Alan Lowe emailed Defendant Dougherty asking if the two could grab a beer that night prior to the Stifel conference in Chicago. Defendant Dougherty responded, "It would be great to grab a beer. Thanks for reaching out." Lowe and Defendant Dougherty went out for drinks that night at the Ritz Carlton at 9:30 pm where over the course of the next hour and a half, Lowe made it crystal clear that he was going to purchase Oclaro. Directly after the meeting, Defendant Dougherty emailed Jefferies updating them on the situation: "Alan would like to buy us. He wants to get together right after thanksgiving to discuss in a small group. He came right out and said it. The driver is fabs and 3D sensing. This one is serious."

66.    On December 6, 2017, Jefferies sent an email outlining a potential deal with Inphi Corporation ("Inphi"), noting the strength of Oclaro's margins and balance sheet compared to its trading price and suggested an Oclaro valuation at $11 per share would be a good deal for Inphi:

*Situation*

• Indus stock has been range bound around $40.00 per share over the last year (~$2bn enterprise value) as organic growth (ex-ClariPhy) and EPS have been flattish
• Yet, our stock has declined to around $7.00 per share relative to the $9.00 LTM VWAP we have had, as our near-term estimates have come down
• Indus shares have traded at a consistent forward (NTM) adjusted P/E multiple of 23x-25x for almost three years
• Indus currently trades at a substantial multiple premium to us on 2018 adjusted P/E - - they are at 20x and we are at 13x
• **Our internal plan is substantially ahead of the limited Street estimates as we move into CY19 (internal estimates for 36% growth versus Street at 15%)**
• Implying, we have a strong case to argue that ***now would be an inopportune time to start discussions given our relative stock price performance compared to***

*relative growth prospects . . .*

*Combination*

• Indus pro forma for a transaction – without any adjustments to discontinue operations by us – will grow faster than stand-alone estimates starting in late 2018 but at a lower gross margin (mid-to-high 50s)
• Contribution to the combined company, adjusted for our greater relative cash balance, suggests ownership in the combined company for us at 50% or more of the combined equity value (versus the 39% implied by our current relative equity market values) - - this argues that even without providing us with credit for any synergies that they are able to pay a substantial premium to market (assuming no reduction in trading multiples)
• A transaction at even substantial premia (50%+, implying **$11/share** or 50% equity ownership for us in an all-stock deal) would be break-even to accretive to their pro forma EPS without synergies
• [Inphi] could have their forward earnings multiple substantially contract (to the mid-teens) and still see a share price increase even at very substantial premia given the significant potential synergies (so they can both pay a high premia, see their multiple contract, and still have their share price increase) . . . they should be able to do a **"good deal" for their shareholders** at substantial premium to us."

We will continue to iterate the materials, but should they get comfortable on the strategic imperative, our ability to achieve a 60% collective gross margin, and the size/scope of the synergies, they should be able to do **a "good deal" for their shareholders** at substantial premium to us.

67.     In discussing the possibility of Oclaro being acquired in a mixed cash and stock deal, Jefferies informed Defendants Dougherty and Mangan of several key points. First, they valued a deal to purchase Oclaro at $11, a price substantially above the value of the Merger Consideration. Second, Jefferies directly stated that it was "an inopportune time" to sell Oclaro given the low stock price relative to Oclaro's strong growth prospects. Third, Jefferies flagged the projections issue for Defendants Dougherty and Mangan noting that Oclaro's internal plan was substantially ahead of the Wall Street estimates for the Company.

68.     On December 7, 2017, Oclaro held a mid-quarter board update meeting. Defendant Dougherty reported to the Board that (i) revenue was *at expectations*; (ii) gross margins, including OCB margins at 43%, and EBITDA were *above expectations*; and (iii) operating income was *"well above" expectations*. Defendant Dougherty then discussed Q3 expectations, noting that revenue was expected to dip in Q3 but bounce back in Q4 and that cash flow was steady.

69.     On December 12, 2017, Rosenblatt Securities' analyst maintained his $10 price target, implying an approximately 42% upside from the stock's closing price of $7.07 per share, and a *Buy* rating for Oclaro securities.  In support of his position, the analyst explained that he believed that the Company's module business in China was not as weak as currently modeled.[17]

70.     As discussions with bidders progressed, Oclaro prepared a set of long-term projections for use in the sales process.  On December 19-20, 2017, Oclaro provided Inphi and Lumentum with the set of "December Projections" from page 107 of the Proxy.  However, just two days later, on December 22, 2017, Oclaro finalized their 3YR Financial Plan – FY19-21 (the "December Projections"), which included FY21 projections and increased FY20 performance:

|  | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| TTL Sales | $601.0 | $557.1 | $656.8 | $918.6 | $1,038.1 |
| Gross MRG | $237.1 | $206.6 | $254.9 | $372.3 | $422.1 |
| OP Profit | $130.8 | $88.0 | $1301.0 | $221.6 | $245.3 |
| Adj EBITDA | $151.6 | $119.0 | $172.5 | $271.4 | $301.8 |
| Free Cash Flow | $78.9 | $56.9 | $129.7 | $230.6 | $261.6 |

71.     The reason the Oclaro Defendants withheld December FY2021 projections from the summary of the December Projections provided in the Proxy is clear: Oclaro shareholders would not have accepted the discounted Merger Consideration if they knew the Company's true long-term value.

72.     On January 4, 2018, CFO Mangan sent the December Projections to Jefferies: "Here is the current draft of the 3YR Plan although it was publish[ed] around Christmas. I do expect another revision early next week which will bring down FY20 revenues mainly for OCB." However, realizing no immediate deal would match Oclaro's value, the Fairness Opinion Projections blew past adjusting OCB revenues for FY20, slashed metrics across the board for FY19-21, and artificially deflated growth rates for FY2022.

---

[17]  *Oclaro (OCLR): China Biz Is Not As Bad As We Thought – Rosenblatt*, Street Insider (Dec. 12, 2017), *available at* https://www.streetinsider.com/Analyst+Comments/Oclaro+%28OCLR%29%3A+China+Biz+Is+Not+As+Bad+As+We+Thought+-+Rosenblatt/13591398.html .

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

73.     Coinciding with the decision to drastically slash projections was the Special Meeting of the Board on January 9, 2018 to discuss the strategic alternatives process. It was at this meeting that the Board decided to approve a plan to execute a deal by February 2018. At the conclusion of the meeting, the Board authorized Oclaro to make an offer for ████████. Despite Oclaro being debt-free with over $300 million in excess cash, this restriction on financing meant that a substantial portion of any acquisition offer would need to come in the form of Oclaro's temporarily depressed stock price, and thus would hamper their ability to make a competitive offer.

74.     On January 10, 2018, Sherwin Cabatic (Oclaro's VP of Product Management) and Defendant LeMaitre discussed Oclaro's revenue projections. Mr. Cabatic was instructed to omit upside from the financial model:

> Cabatic: "Based on the first pass review I think their [sic] might be $500-$750K of additional chip revenue available in each of FQ3 and FQ4."
>
> LeMaitre: "On chips, stick to my numbers for Q3/Q4F18 and **we'll keep any upside in our back pocket**…"
>
> Cabatic: "Yup we are aligned. I was thinking the same things. Didn't make any changes**, just noting *the difference between spreadsheet and reality*.**"

This exchange provides a pithy illustration of Plaintiff's case: <u>the downward engineered Fairness Opinion Projections did not accurately reflect the reality of Oclaro's business.</u>

75.     The next day on January 11, 2018, Defendant LeMaitre informed Defendant Dougherty that Oclaro's OCB segment was outperforming expectations—not declining—from the December Projections.

76.     Over the next few days, Jefferies and Oclaro discussed strategy for the ████████:

> Philip Berkowitz (Jefferies): "Other point is if your shareholders don't believe in your message around *this being temporary and will come back and also that it's the industry* **- then that will make all 3 deals very difficult for us.** We can discuss live at some point. Safe travels."
>
> Defendant Dougherty: "**No worries about shareholders**. they will support all three."
>
> Berkowitz: "Ok. If his board has any belief in his plan **they will tell us to go away**.

1   Same if another buyer sees it differently. I think we are correct though. Good to get
2   this going and start to figure out if a deal is possible here. I predict tim [Inphi] and
    USA [its banker] **won't have favorable reaction** but let's see."

3   77.   On January 15, 2018, Oclaro sent ███████ a ██████ offer

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ███████

8   ████████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████████████████

11  ████████████████████████████

12  ████████████████████████████████████████████.

13  78.   After realizing the market's impact on their ability to acquire ████████, and

14  the corresponding value range of the offers they would receive from acquirers, Oclaro

15  management—at the direction of Defendants Dougherty, Mangan, and LeMaitre—worked to slash

16  the December Projections regardless of conflicting internal or external feedback.

17  79.   On January 17, 2018, Adam Carter, Oclaro's Chief Commercial Officer, sent an

18  initial draft of Oclaro's 3 Year Strategic Plan presentation to Defendant Dougherty, which stated:

19  Market Trends– 3 year view China – Still forecasting slow $ growth in CY18 as
20  demand visibility still poor and inventory on certain components and modules still
    being bled down. ... **China improves in CY19 and for the rest of the plan as**
21  **anticipated** 5G roll-out starts, leading to potential core infrastructure upgrades at
    the same time. Disaggregation accelerates in Datacenter client side optics,
22  *particularly as architectures transition to 400G in the **back end of 3 year plan***.

23  . . .

24  **Summary**: ***Three year plan is achievable***; New product introduction execution
    will be key to *achieving revenue in FY20, FY21*; Support and drive *accelerated*
25  *growth* in chip sales ***through the plan period for both BU's***

26  80.   On January 19, 2018, Oclaro circulated a market view presentation to senior

27  management which showed: (i) "explosive growth of datacenters for servers and smart NIC.

28

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

Biggest being Amazon and Google followed by Microsoft and Facebook. The Chinese datacenters are not as prominent as expected."; (ii) "[I]ncreasing data speeds with distances of more than a few km . . . This is particularly good for Oclaro."; and (iii) "Data rates of 25G, 100G and 400G are the big winners. 800G will appear in 2021/2022. Also good for Oclaro."

81.     On January 24, 2018, Boston Consulting Group ("BCG")—Oclaro's nondisclosed financial advisor—presented to the Board, indicating that any acquisition of Oclaro should be for $10-$13 per share. Though BCG acknowledged the consolidation in the optical industry, BCG recommended Oclaro purchase another optical company and recommended against selling the Company.

82.     On February 5, 2018, Oclaro and Defendant Dougherty publicly announced the positive financial results for the quarter ended December 30, 2017[18] (Q2 2018) that their management team had known for weeks: "[d]espite the known headwinds facing our industry, **the Oclaro team once again produced a very good quarter** . . . . Overall, I was pleased with our strong financial performance for the December quarter and although March will be more than seasonally tough for the reasons that I will highlight later, **we are very well positioned for growth, starting in June**."[19] Oclaro continued to meet the upper end of its revenue guidance and once again exceeded its operating income guidance. Defendant Dougherty then provided reasons Oclaro investors should be **optimistic** about the Company's future prospects:

> Growth in ACO will counter a good portion of the headwinds. Our position in the CFP2-ACO market remains very strong. Well, some competitors have entered the market recently. We have seen very little erosion of our market share. *In large part, our market position is solidified by the long-term contracts* that we have signed with major ACO customers. In fact, we just recently signed another contract extension with one of our key customers. We believe the last quarter's drop in ACO family sales was primarily due to market conditions. We expect our Q3 revenue from the ACO family or product to return to the September 2017 levels and to show **year-over-year revenue *growth* in calendar 2018, while maintaining very good gross margins**.

---

[18]   These were the same results (the majority of which were already known by December 22, 2017) that Defendants claimed in their MTD were accounted for in the Fairness Opinion Projections.

[19]   *Oclaro's (OCLR) CEO Greg Dougherty on Q2 2018 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 5, 2018), *available at* https://seekingalpha.com/article/4143337-oclaros-oclr-ceo-greg-dougherty-q2-2018-results-earnings-call-transcript.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

. . .

As we look **past to the March quarter, we have many reasons for optimism starting with the expectation that many of the headwinds we mentioned earlier should be largely behind us or diminished.** We also continue to believe that the fundamental growth drivers through bandwidth they may impact and should help us resume revenue growth again in the June quarter. Beyond March, we expect to see growth in a variety of products in both the telecom and datacom sectors. In telecom, we expect the major growth drivers to be our ACO and 400 gig families.

. . .

The global 400 gig QSFP56 DD market is projected to be $280 million in 2019 and grow to $720 million in 2020. Our 400 gig EML lasers are already recognizes the best high-speed lasers in the world. We believe that by leveraging our EMLs, **we will have a very strong market position in this emerging area.** We intend to begin shipping QSFP56 DD transceivers later in calendar year 2018. . . . To summarize, **we remained very confident in our future prospects**. We currently believe **the Q3 revenue will represent the bottom** for us. And we will return the sales growth in Q4. Looking ahead to our June quarter, we currently anticipate our Q4 sales to increase by about 5% sequentially. But the revenue guidance is a bit weaker than we would like, our operating model continues to hold strong. For calendar year 2018, we expect to deliver gross margin in the high 30s with double-digit percentage operating income.

83.    Perhaps most interesting is that during the Question-and-Answer Session of the earnings call, Defendant Dougherty affirmed that the Company was **remaining consistent** with their expectations discussed during the Company's First Quarter 2018 earnings call approximately *3 months earlier on November 1, 2017 (**nearly two months before the December Projections were finalized***):

Beyond March, we expect to see growth in a variety of products in both the telecom and datacom sectors. In telecom, we expect the major growth drivers to be our ACO and 400 gig families. These are used in metro in DCI applications. Also as China begins building their own DCO transceivers, we expect to see growth for our ICT/ICR and tunable laser components.

. . .

Michael Genovese: Greg, I heard say that China was strong in the quarter but that's not continuing into the current quarter. So with that in context, could you make a longer term, sort of medium view on what's going on in China and what you expect for the seven quarters?

Greg Dougherty: So, I guess the way to answer that Mike is that, **we had warned people last quarter** not to take a data point and make it a trend. We were hearing of stronger growth in the December, a lot of it due to people building up the inventory going into Chinese New Year. We expect the March quarter to return to the September-ish type levels and I think we anticipate it continuing that way in June and then start to see growth the second half of the year, *which is consistent with what we said on last quarter's call*.

84.     Certainly, if the Company's expectations were consistent between November and February, then there would be no need to reduce the Company's projections during the same period—much less slash every metric for FY19-21 by 9%-36%.

85.     On February 7, 2018, a few days after the announcement of the Company's Second Quarter 2018 earnings and statements made by Defendants Dougherty and Mangan during the earnings call, a financial commentator discussed how Oclaro's situation was already changing, noting that "[t]he [C]ompany retains a *fortress balance sheet and is navigating the storm* maintaining decent margins [and] [n]ew products to be launched soon provide the *necessary growth drivers*."[20]

86.     However, despite the lack of support—and even contradictory data—the Officer Defendants plowed ahead with their cuts. By February 16, 2018, the Fairness Opinion Projections were successfully engineered to slash every financial metric for FY19-21:

| Changes Made from December Projections to Fairness Opinion Projections | | | | |
|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** |
| **Revenue** | | | | |
| December Projections | 557.1 | 656.8 | 918.6 | 1038.1 |
| Fairness Opinion Projections | 551 | 580 | 709 | 784 |
| % Change | **-1.09%** | **-11.69%** | **-22.82%** | **-24.48%** |
| **Gross Margin** | | | | |
| December Projections | 206.6 | 254.9 | 372.3 | 422.1 |
| Fairness Opinion Projections | 212 | 232 | 279 | 304 |
| % Change | **2.61%** | **-8.98%** | **-25.06%** | **-27.98%** |
| **Operating Income** | | | | |
| December Projections | 88.0 | 131.0 | 221.6 | 245.3 |
| Fairness Opinion Projections | 94 | 109 | 144 | 159 |
| % Change | **6.82%** | **-16.73%** | **-35.02%** | **-35.18%** |
| **Adjusted EBITDA** | | | | |
| December Projections | 119.0 | 172.5 | 271.4 | 301.8 |
| Fairness Opinion Projections | 125 | 149 | 192 | 212 |
| % Change | **5.04%** | **-13.62%** | **-29.26%** | **-29.75%** |
| **Free Cash Flow** | | | | |
| December Projections | 56.9 | 129.7 | 230.6 | 261.6 |
| Fairness Opinion Projections | 66 | 111 | 147 | 168 |
| % Change | **15.99%** | **-14.42%** | **-36.25%** | **-35.78%** |

[20]   *Oclaro: The Situation Is Changing Already*, Seeking Alpha (Feb. 7, 2018), *available at* https://seekingalpha.com/article/4143964-oclaro-situation-changing-already.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

87.     When looking at these changes, it is evident that they *were **not*** the reasonable best estimates of Oclaro's future financial performance, and they *do **not*** (as the Defendants claim) reflect Oclaro's actual financial results for the quarter ended December 30, 2018. The changes made from the December Projections to the Fairness Opinion Projections—both positive and negative adjustments—are incompatible with the Oclaro Defendants' contemporaneous statements. As Defendant Dougherty (and others) repeatedly stated, the problems in the marketplace were temporary phenomena that did not deter the Company's optimism about long term future growth plans. However, when you look at the movement in the financial metrics, the Fairness Opinion Projections *actually **increased*** Oclaro's financial performance for the second half of FY2018 (the same period during which the Company provided lower guidance) and ***decreased** all later year* performance. If the negative first-half FY2018 results were really the cause of the changes, then why did the Fairness Opinion Projections increase the FY2018 financial metrics? And if, as repeatedly emphasized, Oclaro was uniquely positioned to capitalize on rising data communication speeds (as 100G+ and 5G wireless products became the standard), then how did ***nine days***[21] of Company performance completely shatter Oclaro's long-term plans without any public discussion on the matter? The short—and only—answer is that the changes in the Oclaro Projections from December to February expressed the "*difference between spreadsheet and reality*." While the Oclaro business was set to struggle for the next few quarters, it was set to thrive—not drastically decline—for years to come. The changes to the Fairness Opinion Projections reflect the opposite.

88.     As discussed in greater detail below, the unwarranted cuts to the later year projections had a ***significant** impact on valuation* because they substantially lowered Oclaro's terminal value. Here, as calculated by Jefferies, the terminal value accounted for over 80% of Oclaro's enterprise value. Thus, reducing the later year projections was the most efficient way for Defendants Dougherty, Mangan, and LeMaitre to lower the valuation of Oclaro into the range of an offer price they could obtain. Therefore, by making unreasonable slashes to the December

---

[21]  From December 22, 2017 to December 31, 2017.

Projections, the Oclaro Defendants misled shareholders into believing that the Merger Consideration was a premium to Oclaro's "fair" value.

89.     Even Jefferies could not make sense out of the changes made to the December Projections. Based on their reaction, Jefferies was out of the loop on the Officer Defendants' planned reduction and confused by their decision: "That doesn't seem to show up in improved margins in the model relative to the December model we used? Maybe I am missing it. Could be worth a call with us to just make sure we understand tomorrow. And understand if this is plan. Not sure what we would share with Nile just yet." Jefferies then removed Defendant Mangan from the email chain and continued to discuss:

> Berkowitz: "*Taking off client.* **I'm confused on this.** *Also not sure what their plan is on this* and if this is a plan for Inphi or street. Defn not to Street bc they wouldn't shut down yet. **Just not sure I understand all this.**"

> Kelly Halter: "For the margins, there is a slight improvement in gross margin mainly in CY 2018 from the Orion model from 12/22/17 to 1/23/18: [MISSING IMAGE]"

> Berkowitz: "But then why such a negative difference in ebitda"

90.     In addition to slashing every metric for FY19-21 by 9%-36%, the Fairness Opinion Projections cut the final-year revenue growth rate all the way down to 6%, while holding margins flat. This reduction also caused a disproportionate impact on the valuation of Oclaro through the reduction to its terminal value. For example, by using a reduced 6% FY 2022 revenue growth figure instead of even a lower-end double digit growth rate, like the 10.6% figure used by BCG, the Fairness Opinion Projections instantly shaved approximately $50 million of value from Oclaro—approximately $3.7 million in present value of 2022 unlevered free cash flow and over $46 million in present value of the terminal value.

91.     Multiple sources indicate that a double-digit growth rate was the appropriate FY2022 revenue growth rate for Oclaro. First, the December Projections used a 13% growth rate for the final-year revenue growth rate. Second, BCG in their January 24th presentation to the Board stated that the overall optical market would grow at CAGR of 11% in 2022, and then used a 10.6% growth rate to calculate their FY2022 Oclaro revenue projection. Third, numerous other sources,

including many cited herein, indicate double-digit long-term growth rates for the optical communications industry

92.     These combined changes made from the December Projections to the Fairness Opinion Projections caused sharp decreases to Oclaro's compound annual growth rates ("CAGR")—the metric selected by Oclaro to describe the Oclaro Projections in the Proxy:

| | Revenue | Net Income | Adj EBITDA | Free Cash Flow |
|---|---|---|---|---|
| **December Projections** | 28.7% CAGR | 51.4% CAGR | 49.4% CAGR | 100.9% CAGR |
| **Fairness Opinion Projections** | 10.9% CAGR | 10.6% CAGR | 16.2% CAGR | 28.3% CAGR |

93.     The CAGRs represented above for Revenue, Net Income, and Adj EBITDA were taken directly from page 105 of the Proxy. Plaintiff's Counsel, with assistance from Plaintiff's financial expert, had to calculate[22] the Free Cash Flow CAGR for himself using the projections provided on page 107 of the Proxy. Given, the conspicuously large change in Free Cash Flow CAGR from the December Projections to the Fairness Opinion Projections, it is again clear why the Oclaro Defendants withheld the Free Cash Flow CAGRs from the summary provided in the Proxy: Oclaro shareholders would not have accepted the discounted Merger Consideration if they knew how much long-term Free Cash Flow (arguably the most important metric to shareholders) value was deleted in creating the Fairness Opinion Projections.

94.     Notably, the Oclaro Defendants never provided the entire set of Fairness Opinion Projections illustrating the full scope of their downward adjustments to any bidder—only to Jefferies. On February 12, 2018, Defendant Dougherty sent an earlier version of the Fairness Opinion Projections, without 2022, to Alan Lowe at Lumentum. However, Defendant Dougherty did not refer to projections sent as the new management projections or the updated management case. Instead, Defendant Dougherty referred to the lower case of projections as "our ***conservative case*** for our 3 year financials," communicating the fact that the Oclaro Defendants did not view

---

[22]  The formula for calculating CAGR is: CAGR = ((Ending Value / Beginning Value) ^ (1 / number of years)) – 1. *See* https://www.investopedia.com/terms/c/cagr.asp

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

these figures as the most accurate projections, but rather thought these numbers would be lower than Oclaro's actual performance.

95.     On March 2, 2018, Defendant Dougherty met with the CEO of Inphi. During this meeting the CEO of Inphi communicated two pieces of information. First that Inphi was raising its offer to $8.25 per share, representing an ownership for Oclaro shareholders of 38% of the combined company.[23] But second, and more importantly, Inphi recognized the limitations in their offer price—caused by the temporary market downturn—and requested to reconvene in six months when stock prices would be higher and they could afford to make a more robust offer. This is significant information and corresponds directly to Oclaro's inability to acquire ███████████, statements provided by Jefferies, and the theme of this case: **It was the wrong time to sell Oclaro and the Officer Defendants knew this but orchestrated the sale of the Company anyway in order to serve their own personal interests**.

96.     However, despite the importance of the information, Defendant Dougherty never communicated this message to the Board—though he did tell Defendants Mangan and LeMaitre. At the March 3, 2018 Board meeting, Defendant Dougherty simply told the Board about the $8.25 offer price, but left out that Inphi wanted to offer even more consideration once the industry had rebounded. This information was material and should have been conveyed to the Board.

97.     Also on March 2, 2018, David Trainer published an article discussing how Oclaro's stock price *considerably undervalued* the Company's true value.  Specifically, Mr. Trainer explained that the markets "ignored the overall profitability of the company and focused on disappointing results out of China,"[24] which was confirmed by the discounted cash flow model that showed Oclaro's stock was worth approximately **$11 per share**, illustrating an 65% premium to the current stock price and a 32% premium to the then-proposed Merger Consideration. *Id.*

---

[23]  Following the completion of the Merger, Inphi Corp's stock price increased **484%**, from $29.52 on March 2, 2018 to $172.27 earlier this year when they were acquired by Marvell. Accordingly, a 38% share of just Inphi (not the combined company accounting for additional Oclaro value) would be worth more than the entire value of the Merger Consideration.

[24]  *Oclaro: The Market Doesn't Appreciate This Tech Company's Growth*, Seeking Alpha (March 2, 2018), *available at* https://seekingalpha.com/article/4152793-oclaro-market-appreciate-tech-companys-growth.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

Notably, this $11 figure is directly in-line with ==Jefferies recommendation==, ==BCG's recommendation==, and ==the damages calculated by Plaintiff's financial expert.==

98.     On March 7, 2018, *after the Fairness Opinion Projections had been prepared*, Defendant Dougherty made a presentation at the Raymond James & Associates' 39th Annual Institutional Investors Conference highlighting Oclaro's strong operational and financial prospects and touting their market and technology leadership in high bandwidth products. [25] Overall, the presentation focused on the future growth/demand of higher bandwidth products and Oclaro's ability to capitalize on these changes. On page 3 of the slideshow, Defendant Dougherty represented that Oclaro had "Strong financials," "Market Leadership At 100G and Beyond," and was "Well Positioned In High Growth Markets." On page 6 of the slideshow, Defendant Dougherty touted Oclaro's "Continued Strong Financial Model."

99.     The slideshow then laid out Oclaro's "Foundation For Sustained Growth" touting the higher bandwidth Oclaro technology:



---

[25]    *Oclaro (OCLR) Presents At Raymond James 39th Annual Institutional Investors Conference – Slideshow*, Seeking Alpha (March 8, 2018).

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Data Center Market View  - 400G Single-Mode Market



- Single-mode duplex fiber dominating 400G intra-DC connections
- 4 x 100G PAM4 lasers and ICs required
- EML key technology to deliver bandwidth complemented by PAM4 DSPs
- Silicon Photonics likely to be limited to 500m or below

Data is a combination of LightCounting report 10/17, Ovum report 4/17 and company estimates



OCLARO   © 2018 Oclaro, Inc.  | Confidential and Proprietary   18

## >10G Transceivers In Wireless Fronthaul And Backhaul



- 5G Wireless Schedule:
  - Field Trials – 2017; Pre-Commercial - 2018-2019; Commercial Launch - 2020
- 25G SFP28  transceivers to be used in Point to Point Fronthaul from BBU to cell tower.
- 10G DWDM Tunable transceivers used in Point to Point Fronthaul applications where fiber plant is scarce.
- **Oclaro leads the market with 25G SFP28 and 10G DWDM Tunable SFP+  I-Temp solutions**

OCLARO   © 2018 Oclaro, Inc.  | Confidential and Proprietary   21

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

## New Cable Remote PHY / Fiber Deep Architecture

**WW CWDM/DWDM Transceiver Revenue - $M Dollars**

## Foundation For Sustained Growth

Multiple Market Drivers Continue: Data Center, Metro, China, 5G Wireless

Market And Technology Leadership At 100G And Beyond Speeds

Continued Profitable Execution

Strong Cash Flow And Overall Balance Sheet

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

100.     However, Oclaro's public common shareholders would never have the opportunity to reap the benefits of their investment and realize the true value of the Company. After a period of half-hearted negotiation with Lumentum, on March 11, 2018, Oclaro and Lumentum agreed on the derisory Merger Consideration and executed the Merger Agreement.

101.     True to Oclaro's pattern of under-selling and over-delivering, on May 6, 2018, Defendant Dougherty reported Oclaro's third quarter 2018 results, which, yet again, exceeded or were on the upper end of guidance: [26]

> I am very pleased with the results that the Oclaro team delivered for our third fiscal quarter. Our revenue of $127 million, which was at the high end of our guidance, was driven by a record revenue quarter for our CFP2-ACO product family and laser chip business. The strong sales mix resulted in non-GAAP gross margin of 37 percent, and non-GAAP operating income of $18 million, which exceeded our guidance, and marked the eighth consecutive quarter of double digit operating income percentage.

This once again confirmed the stark and unwarranted difference between the downward adjusted "spreadsheet" numbers used to value Oclaro in the Merger and the "reality" of Company's actual growth prospects.

## II.     The Oclaro Defendants Authorized the Proxy to be Disseminated to Oclaro's Shareholders, Which Provided a Misleading Picture of Oclaro's Valuation and Future Financial Prospects

102.     On June 1, 2018, Defendants solicited or allowed their names to be used to solicit Oclaro's shareholders to vote in favor of the Merger via the false and misleading Proxy. The Oclaro Defendants caused the Proxy to be filed with the SEC and disseminated to Oclaro shareholders. The Proxy recommended that Oclaro shareholders vote in favor of the Merger but misrepresented material information about the intrinsic value of Oclaro and the future prospects of the Company and caused Oclaro shareholders to cast uninformed votes in favor of the unfair Merger.

103.     Specifically, the Proxy contained the following false and/or misleading material statements: (i) that all of the Oclaro Projections "were prepared on a *reasonable basis*, reflecting the *best currently available estimates* and judgments at the time of their preparation," and reflected

---

[26] *Oclaro Announces Third Quarter Fiscal Year 2018 Financial Results*, Seeking Alpha (May 6, 2018), *available at* https://seekingalpha.com/pr/17155761-oclaro-announces-third-quarter-fiscal-year-2018-financial-results.

the "*good faith judgments* of the management of Oclaro as to the *future financial performance of Oclaro*," (the "Projections Statements"); and (ii) the implied equity reference ranges per share that were calculated by Jefferies using the downwardly revised Fairness Opinion Projections (the "Valuation Figures").

104.    First, the *Certain Unaudited Prospective Financial Information* section of the Proxy discloses the sets of Oclaro's projected future financial performance and states that each was created by Oclaro's management and "prepared on a reasonable basis, reflecting the best currently available estimates and judgments at the time of their preparation." Proxy at 105.

105.    The Proxy further provides that the Oclaro Projections "were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of Oclaro as to the future financial performance of Oclaro." Proxy at 97.

106.    However, the bounty of statements made by Oclaro and its management during the numerous earnings calls and presentations and the internal statements made by Oclaro management indicate the adjustments made from the December Projections to the Fairness Opinion Projections were **not** prepared on a reasonable, good-faith basis, as they did not reflect the Oclaro Defendants' legitimately held views regarding Oclaro's true financial prospects. Indeed, Defendant Dougherty made statements immediately ***before, during, and after*** the creation of the Fairness Opinion Projections asserting that Oclaro was well-positioned and poised for long-term growth that refute the substantially more pessimistic view of the Company's long-term earning potential portrayed in the Fairness Opinion Projections. As explained in detail above, (i) Oclaro had repeatedly met or exceeded management's guidance in the period leading up to, and following, the creation of the Fairness Opinion Projections (*see, e.g,* ¶¶ 34-35, 37, 42-44, 55-56, 60, 82-83, 101); (ii) the industry-wide issues Oclaro was facing concerning the Chinese market were a temporary, short-term phenomenon (*see, e.g,* ¶¶ 44, 60, 76-77, 135); and (iii) Oclaro's management team, particularly Defendant Dougherty, repeatedly touted the Company's expected long-term growth prospects both *before and after* they created the Fairness Opinion Projections (*see, e.g.,* ¶¶ 34, 37, 44, 56, 60, 79-80, 82, 98-99).

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

107.   It is important to note that Oclaro was conservative in creating its financial projections, continually meeting the upper end or exceeding their projections. Indeed, in every quarter discussed herein,[27] Oclaro either met the upper end or exceeded their guidance for both revenue and operating income:

| Fiscal Quarter | Date | Revenue Guidance | Operating Income Guidance |
|---|---|---|---|
| Q1 2017 | November 1, 2016 | Exceeded Guidance | Exceeded Guidance |
| Q2 2017 | January 31, 2017 | Upper End of Guidance | Exceeded Guidance |
| Q3 2017 | May 2, 2017 | Upper End of Guidance | Exceeded Guidance |
| Q4 2017 | August 2, 2017 | Upper End of Guidance | Exceeded Guidance |
| Q1 2018 | November 1, 2017 | Upper End of Guidance | Exceeded Guidance |
| Q2 2018 | February 5, 2018 | Upper End of Guidance | Exceeded Guidance |
| Q3 2018 | May 2, 2018 | Upper End of Guidance | Exceeded Guidance |

108.   Moreover, the Proxy's only discussion of the severe downgrades made to the Oclaro Projections simply recited the downward adjustments in terms of CAGR, Proxy at 105, but failed to disclose **any reason or rationale** that would explain, support, and/or justify the unreasonable downgrades in Oclaro's CAGR. In other words, the Proxy failed to provide any supporting explanation or justification for the drastic reductions to the future value of the Company because no valid explanation existed and the reductions were unjustified.

109.   Below is a chart illustrating the changes that were made to Oclaro's compounded annual growth rates for Revenue, Net Income, Adjusted EBITDA, and Free Cash Flow:

| | Revenue | Net Income | Adjusted EBITDA | Free Cash Flow |
|---|---|---|---|---|
| **December Projections** | 28.70% | 51.40% | 49.40% | 100.90% |
| **Fairness Opinion Projections** | 10.90% | 10.60% | 16.20% | 28.30% |
| **Total Change in CAGR from the December Projections to the Fairness Opinion Projections** | **-17.80%** | **-40.80%** | **-33.20%** | **-72.60%** |

110.   To fully appreciate the impact of this considerable reduction from the December Projections to the Fairness Opinion Projections, you need to first understand that CAGR is the rate

---

[27]  After reviewing earnings announcements dating back to 2014, Plaintiff's Counsel was unable to find a single instance of Oclaro missing its revenue projections.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

of growth of an investment over a period of time.[28]  It signifies one of the *most accurate* ways to calculate and determine returns for individual assets, investment portfolios, and anything that can rise or fall in value over time. *Id.* In other words, CAGR is a pro forma number that tells you what an investment yields on an annually compounded basis indicating to investors what they really have at the end of the investment period. Accordingly, these huge reductions, especially the reductions to the Free Cash Flows (left out of the Proxy CAGR summary) are important to shareholders for two particular reasons: (i) it is the method chosen to describe the Oclaro Projections in the Proxy; and (ii) it allows shareholders to succinctly appreciate the value change over time from the December Projections to the Fairness Opinion Projections.

111.    Therefore, the Fairness Opinion Projections reflect unwarranted, contradicted, and substantial downward adjustments to the December Projections, and the Projections Statements touting the Fairness Opinion Projections as "reasonable" "good faith" "best estimates" are materially false and misleading.

112.    Second, the Valuation Figures included in the Proxy (pages 99-103) were based on these unreasonable reductions that dramatically impacted the financial valuation of Oclaro, and, therefore, dramatically misled shareholders regarding the fair value of Oclaro.

113.    In particular, the cuts to the later year projections, which, uncoincidentally, were the largest cuts made in the Fairness Opinion Projections, were both those most contrary to Defendants' contemporaneous statements and caused shareholders the most harm. Changes in later year metrics have a disproportionate impact on valuation, because they lower the terminal value of the company and greatly reduce the results of the discounted cash flow analysis ("DCF")—widely-regarded as the most important valuation methodology.[29]

---

[28]  *Compound Annual Growth Rate: What You Should Know*, Investopedia (Feb. 26, 2018), *available at* https://www.investopedia.com/investing/compound-annual-growth-rate-what-you-should-know/.

[29]  "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110 ("Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various

114.   As its name suggests, a discounted cash flow analysis calculates the value of a business based on its projected future free cash flows and then discounts the projections to their present value.[30]  First, an estimate is made of the future free cash flows of the corporation over a set period of time.  Second, a value of the corporation's free cash flows beyond that discrete period (usually in perpetuity) is forecasted.  This second value is known as a terminal value, and it is typically calculated by applying a perpetual growth rate to the estimated cash flow in the final year of the discrete period.  Third, the cash flows and terminal value derived in the first two steps are both discounted back to the present by an appropriate discount rate (to account for the time value of money) to arrive at a present value of all of the future cash flows of the corporation.[31]

115.   In companies poised for growth, the terminal value will always be a large proportion of the total value. That is a reflection of the reality that the bulk of your returns from holding a stock comes from price appreciation.[32] As growth increases, the proportion of value coming from terminal value will go up. In fact, the present value of the terminal value can be greater than 100% of the current value of the stock.[33] Therefore, lowering the later years of a discrete projection period—especially the final year—has a disproportionate effect on the overall valuation of a company as compared to the earlier years, because it lowers the corresponding terminal value based on the final year of projections.

---

fields of finance."); CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014 ("In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation.").

[30]  *Discounted Cash Flow (DCF)*, Investopedia, *available at* https://www.investopedia.com/terms/d/dcf.asp.

[31]  *See* Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. at 1574 n.73 (collecting sources and outlining the methodology for conducting a DCF analysis).

[32]  Damodaran, Aswath. *Growth Rates and Terminal Value: DCF Valuation*, p. 48.

[33]  *Id.*; *Terminal Value Calculations in a Financial Model*, Corality, ("An estimate of terminal value is critical in financial modelling as it accounts for a large percentage of the project value in a discounted cash flow valuation."); *Terminal Value*, Macabacus, (indicating that the shorter the length of the projections, the greater an impact on the DCF analysis because "the terminal value can constitute approximately 75% of the value in a 5-year DCF and 50% of the value in a 10-year DCF.").

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

116.   Here, the downward revisions decreased the free cash flows from the December Projections to the Fairness Opinion Projections by as much as 36% in 2021. Had Oclaro calculated FY2022 projections in December using appropriate, good-faith growth figures, the percent change would likely be *even higher*. Still, 36% is a substantial decrease that materially impacted the valuation of Oclaro and the implied equity reference range found in Jefferies' DCF Analysis. Moreover, as explained above, this large reduction to the final years of the Fairness Opinion Projections had an even greater impact on Oclaro's terminal value, which accounted for over 80% of Oclaro's valuation. Accordingly, if you were to perform a discounted cash flow analysis using the December Projections, the per share valuation of Oclaro would be $12.32, or $2.33 more than the $9.99 valuation of the Merger Consideration stated in the Proxy and $3.96 more than the value of the Merger Consideration shareholders actually received when the Merger was consummated on December 10, 2018.[34]

117.   Simply put, the Oclaro Defendants—via Jefferies—were only able to portray the Merger Consideration as "fair" to Oclaro shareholders by creating the downward revised Fairness Opinion Projections and approving their use by Jefferies in its valuation analyses. Consequently, the Fairness Opinion Projections were engineered to present the unfair Merger Consideration as "fair," not to reflect management's legitimately held views.

118.   Therefore, the Valuation Figures calculated by Jefferies using the Fairness Opinion Projections and included in the Proxy to show the Merger Consideration to be within an artificial range of fairness materially misled Oclaro shareholders. In other words, the Valuation Figures misled Oclaro shareholders as to what they were actually giving up in exchange for the Merger Consideration. The mythical business that was presented in the Proxy and valued using the Fairness Opinion Projections resulted in per share valuation figures for Oclaro that were false and misleading in that they led Company shareholders to believe the Merger Consideration was "fair."

119.   The Individual Defendants were aware that the downward revised Fairness Opinion Projections were materially false and misleading in that they did not reflect Oclaro's true future

---

[34] Plaintiff's Counsel could not calculate this valuation figure without the assistance of a financial expert who utilized information obtained during the ongoing discovery process.

financial prospects. Consequently, by including these statements in the Proxy soliciting shareholder approval of the Merger, the Oclaro Defendants misled shareholders into believing that the Merger Consideration was actually fair value for Oclaro shares, and that the Merger was in the best interest of Oclaro shareholders when neither was true.

120.    Despite the Oclaro Defendants being fully aware that there is no more material information to shareholders than the information underlying or supporting the financial value of their shares and the Merger Consideration being offered, the Oclaro Defendants misrepresented the above-mentioned material information to Oclaro shareholders. The downward reductions made to the December Projections were not made in "good faith" and there was no "reasonable basis" for them—in fact, no basis or rational explanation for revisions was even disclosed. Therefore, the Fairness Opinion Projections and the Projections Statements touting the Fairness Opinion Projections presented a misleading picture of Oclaro's future financial performance, and the Valuation Figures based off the misleading Fairness Opinion Projections directly misled Oclaro shareholders as to the true value of their shares.

121.    Additionally, the retention of BCG as a second financial advisor was entirely omitted from the Proxy. BCG was hired by Oclaro in late 2017 to provide strategic merger advice and recommendations. BCG provided multiple presentations to the Board regarding both the valuation of Oclaro and the best course of action on strategic alternatives. This information is plainly material to a vote by Oclaro shareholders on the Merger and needed to be disclosed.

122.    Indeed, the contents of the BCG presentations strongly indicate that the Merger Consideration was a bad deal for shareholders. On January 24, 2018, BCG gave a presentation to the Board indicating that any deal for the acquisition of Oclaro should be $10-$13 per share. These indications of value represent critical qualifying information that runs directly contrary to the statements in the Proxy that the Merger Consideration represents fair value for Oclaro shares. Therefore, these omissions render statements in the Proxy actionable half-truths under Section 14(a).

123.    This omission also represents a *per se* violation of Section 14(a). Information surrounding the retention of an outside advisor and the presentations they gave to the Board is

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

information required to be disclsoed by federal regulation. 17 CFR § 229.1015 (requiring a summary of "any report, opinion . . . or appraisal" "relating to the consideration . . . to be offered to security holders."); 17 CFR § 240.14a-101 ("If a report, opinion or appraisal materially relating to the transaction has been received from an outside party, and is referred to in the proxy statement, furnish the information required by Item 1015 . . . ."). The SEC broadly delineated the scope of these regulations by both their (i) plain text (*See Black's Law Dictionary* 1326 (Eighth ed. 2004) (defining "report" as a "formal oral or written presentation of facts or a recommendation for action.")) and (ii) subsequent Compliance and Disclosure Interpretations ("C&DI") (stating as an example that Item 1015 applied even when "the financial advisor does not analyze or advise on the consideration to be paid to target security holders in the acquisition" and the financial advisor "does not provide written materials to the acquiror."). C&DI Question 117.06.[35] Thus, the presentation of valuations and strategic recommendations concerning the Merger and contradicting the contents of the Proxy qualifies as a "report, opinion or appraisal materially relating to the transaction" and triggers the disclosure requirements, which the Oclaro Defendants blatantly violated.

### III. Both the Officer Defendants and Jefferies Faced Disabling Conflicts of Interest, and the Board Knew That the Fairness Opinion Projections Did Not Reasonably Reflect the True Value of Oclaro

124.  First, Defendants Dougherty, Mangan, and LeMaitre each faced personal and financial conflicts of interest that motivated them to support the Merger despite knowing it was unfair to shareholders.

125.  Each of the Officer Defendants stood to receive millions in golden parachute compensation from the Merger, much of which they may not have received otherwise:

| Defendant | Cash | Equity | Benefits | Total |
|---|---|---|---|---|
| Greg Dougherty | $2,400,000 | $7,642,395 | $144,000 | **$10,186,395** |
| Pete Mangan | $757,750 | $3,678,374 | $72,000 | **$4,508,124** |
| Yves LeMaitre | $757,750 | $3,428,124 | $72,000 | **$4,257,874** |

---

[35]  Available at https://www.sec.gov/divisions/corpfin/guidance/13e-3-interps.htm

126. Notably, the equity component listed in the table above—comprising the large majority of each officer's golden parachute payments—was not a representation of the shares of Oclaro common stock owned by each Officer Defendant, but the cash amount of unvested equity units held by each Officer Defendant. This is a substantial distinction, as each Officer Defendant was uncertain whether they would have ever received the millions of dollars in equity awards but for the Merger.

127. Moreover, these equity awards were conspicuously granted in August 2017 (Q1 2018), just as Oclaro started having a clear view of the temporary softness in China. This timing indicates that the Officer Defendants did not want to dig in, do the work, and lead Oclaro through this temporary trough, but, instead, to exit the Company with a pile of cash and pursue their retirement, or the twilight of their careers, elsewhere—with less demanding obligations.

128. Leading up to Oclaro's First Quarter 2018 earnings announcement (November 1, 2017), Defendant Dougherty's close friends and colleagues were (i) expressing concern regarding the stress Defendant Dougherty was under ███████████████████████████ ███████████████████; and (ii) hoping he would find a way to reduce the toll. This sense of tough (but temporary) sledding to come was confirmed by internal emails from the Board.

129. On November 1, 2017, Defendant Small—the newly appointed member of the Board—attempted to motivate and encourage Defendant Dougherty through the temporarily choppy waters: "It's always hard to message 'We had a great quarter, the future looks a bit grim, but chin up! Let's redouble our efforts!' and you did it well. Coming off the last 18 months of continuous 'winning', the upcoming quarters could be more difficult to navigate from a morale standpoint - some people may have 'flashbacks' to previous downturns and what it meant for the business. IMHO, it will be very important for you and the management team to touch as many of the employees personally as you can, and to reassure, recharge and focus them on the ongoing challenge and to let them know that thanks to their efforts, the Oclaro business is built to withstand cyclical turbulence in a way the old Oclaro wasn't. Q118 was an impressive achievement. You and the team should be proud. I have great confidence in our collective ability to navigate the choppy waters better than most of our competitors. Let me know anything more I can do to help."

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

130.   Accordingly, based upon the confluence of factors facing Oclaro, Defendants Dougherty, Mangan, and LeMaitre had two options: 1) steer the Company through the next couple of rough quarters, and wait to take any corporate action until true value presented itself; or 2) cash-in on the millions of dollars of freshly issued equity awards and sell Oclaro at its low point. They chose the latter and orchestrated the creation of the downward revised Fairness Opinion Projections to justify their decision.

131.   Each of the Officer Defendants had their own personal interests in mind when steering a sale of Oclaro, which caused them to favor the Merger even though they knew it was not in the best interests of the Company's shareholders.

132.   Defendant Dougherty ███████████████████████ of being the CEO of an international corporation with a large portion of business in Asia and wanted to take a step back from the responsibility of day-to-day operations to join the director circuit. Indeed, when Defendant Dougherty was approached by a managing director from an investment bank inquiring about his interest in potential CEO roles, he turned them down, stated he did not want to be a CEO again, and that was looking for board positions:

> Thanks.  Happy to talk to whomever.  On my end, I am thinking about board positions, and don't plan to do a CEO again.  Let me know when you are out here. It would be great to catch up.

133.   And Defendant Dougherty ultimately succeeded in his goal, as he soon took cushy positions as a member of four different boards of directors in the optical communications industry.

134.   Similarly, Defendant Mangan was also angling for retirement and to spend more time with his family. Shortly after Oclaro approved the equity award grants in August 2017, Defendant Mangan began planning his retirement down to the minute detail. ████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ Cashing in on his golden parachute compensation from the Merger was a quick and easy way to finance his retirement plans, and it appears that Defendant Mangan would not be able to afford such an extravagant lifestyle without the immediate infusion of cash provided by his golden parachute compensation. Then, in June 2018, after Lumentum's CFO resigned, Mangan was in the running

to become the permanent replacement for the position. Lowe was interested in bringing Mangan on board; however, Mangan valued the full immediate vesting of the equity awards and time off from work—████████████████████████████████████████████ ████████████████████████—and settled for a three-month transition role that netted him an additional $150,000 in salary and a new grant of $300,000 in Lumentum equity awards—a benefit not equally shared by Oclaro public shareholders.

135. In February 2018, after helping engineer the Fairness Opinion Projections, Defendant LeMaitre was promoted to Chief Strategy Officer—a position he desired to keep with the larger, post-close Lumentum. However, he was initially offered a much lower role in Lumentum's Datacom business unit. Only through Defendant Dougherty's lobbying of Alan Lowe was Defendant LeMaitre able to continue onto post-close Lumentum occupying the Chief Strategy Officer role. Securing this position allowed Defendant LeMaitre to double dip on the equity awards with accelerated vesting on his Oclaro equity awards and a new grant of $700,000 in Lumentum equity awards. Along with additional salary compensation of $370,00 per year, this new grant of equity awards allowed Defendant LeMaitre to fully participate in the future growth of the Company—a benefit not equally shared by Oclaro public shareholders.

136. Finally, the Officer Defendants knew that selling Oclaro in early 2018 would result in a price that was far below Oclaro's fair value. In addition to Defendant Dougherty's own comments that the Company's value was at "bottom" during the sales process, Jefferies had repeatedly told them it was a bad time to sell:

- On November 1, 2017, discussing the effect of the Q1 2018 earnings announcement on Oclaro's ability to make any acquisitions: "Hang in there!! . . . Challenging for us to pay a way outsized premium (and a non accretive deal) with our stock down this much right now."

- On November 3, 2017, discussing a potential deal with ████████████: "I think you will have to sell to ██ that just like he may feel it's a bad time to sell at 4.50 it's a bad time for us to use our stock here.  and we will need to make the case what stock is worth over time etc . . ."

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

- On December 2, 2017, "In fact sub optimal time to sell today given what we discussed about our March quarter. That troughs in (June?) and we then grow again as usual. Our fiscal and Calendar 2019 (June 18 forward) is going to be very strong. This is a trough valuation today for us."

- On December 6, 2017, "now would be an inopportune time to start discussions given our relative stock price performance compared to relative growth prospects . . ."

- On December 8, 2017, discussing strategy for a talk with Lumentum: "That message is what we discussed Around: not great time for us . . . we believe we have terrific momentum and are positioned very well for continued success and have a strategic position in the industry."

- On December 18, 2017:

  As I have discussed, not a great time for us to have sale discussions
    ○ Our business position and prospects are very strong
    ○ We are facing a temporal slow down in the market (expand: China . . .) which will likely impact our March quarter (which is lower than Street – they may surmise, but we only provide a quarter of actual guidance)
    ○ Consequently, our stock is trading near its 52-week lows and we are undervalued
    ○ We have strong conviction based on specific knowledge of our prospects that the business will get much stronger in the back half of 2018 and into 2019
    ○ We were trading in the double digits several months ago, and should trade back to that level on our own over the coming quarters
    . . .

  This is noting two key things:
    1. We won't support a deal at 9-9.50 --- that's the math on normal m&a premium off your stock price – if they did the math and off today
    2. We believe we can get back to double digits on our own and we are patient… implies need to see a double digit stock price as part of upfront premium.

- On February 12, 2018, "market m&a premiums off our temporal lows will not get our board excited not a great time for us to have these discussions given our current stock price, valuation and strong prospects."

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

- On February 21, 2018, "We are at a cyclical trough in our financial performance, from which we have line of sight visibility into continued revenue growth in the second half of this year and beyond — even with multiple contraction our share price should exceed your Offer by later this year."

137.   Publicly, the Officer Defendants touted the Merger as a success, but internally, they knew that the Merger Consideration was far less than fair value for Oclaro.

138.   For example, the Proxy lauded the purported 27% premium the Merger Consideration represented to Oclaro's trading price as one of the material reasons for shareholders to support the Merger. In reality, Defendant Dougherty literally laughed at Alan Lowe when he proposed a 24% premium as an offer for Oclaro. By the time the deal closed, shareholders only received $8.36 worth of Merger Consideration, representing a derisory 6% premium to Oclaro's trading price prior to the Merger Agreement.

139.   Another example: on March 7, 2018, Defendant Mangan emailed Defendant Dougherty proposing the press release headline for each party to the Merger:

[Lumentum]'s: "Best in Breed Optical IP join Forces"

[Oclaro]: "**Dougherty sells 2nd Company for $40B Discount**"

140.   In sum, despite knowing that they were selling Oclaro at a severe discount to its fair value, the Officer Defendants placed their own personal interests ahead of maximizing shareholder value and forced an immediate sale of the Company at a price far below fair value.

141.   Jefferies also had their own significant conflict of interest, which prevented them from being the voice of reason in the room and plagued their ability to render an independent and unbiased fairness opinion. In May 2014, Oclaro engaged Jefferies and agreed to pay them a fee—estimated at approximately $30.1 million—only $1 million of which was payable to Jefferies at the time they delivered their opinion, and *97% of which was contingent and payable only upon the consummation of the Merger*. In other words, if Jefferies had protested to the timing of the Merger, refused to use the downward revised Fairness Opinion Projections in their analyses, or rendered an opinion not supporting the "fairness" of the Merger, they would have lost virtually all their compensation for nearly four years of work.

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

142.     As is well documented in academic literature, bankers are notorious for capitulating to their clients and supporting whatever deal they can consummate. *See* Jonathan R. Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. REV. 591, 618-23 (March, 2013) (explaining that "obtaining a fairness opinion has become like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate."); Steven M. Davidoff, *Fairness Opinions*, 55 AM. U.L. REV. 1557 (August 2006):

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…*conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.*

> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction.  This will ensure future lucrative business.

(emphasis added). Accordingly, it was virtually guaranteed that Jefferies would *not* risk ostracizing itself in the investment banking community by declining to render a fairness opinion.

143.     As for the Board, each director was aware of the statements made by the Company and management leading up to the Merger. They were also presented the Fairness Opinion Projections and discussed them with management. They knew the inconsistences between the management statements before, during, and after the creation of the Fairness Opinion Projections and the contents of the Fairness Opinion Projections, but still approved the Fairness Opinion Projections for use in Jefferies' fairness opinion analyses. They then allowed the Proxy to be disseminated to Oclaro shareholders containing statements that were contrary to their knowledge: that the engineered Fairness Opinion Projections "were prepared on a reasonable basis, reflecting the best currently available estimates and judgments at the time of their preparation" and "were

reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of Oclaro as to the future financial performance of Oclaro." The Board members also allowed the Proxy to be disseminated to Oclaro shareholders containing the misleading valuation ranges that resulted from Jefferies use of the unreasonably low Fairness Opinion Projections. The Board knew that since these Valuation Figures were prepared using the unreasonably low Fairness Opinion Projections that they too were unreasonably low and did not fairly or accurately inform shareholders of the true value of Oclaro.

**IV.    The False and Misleading Proxy Caused Oclaro Shareholders Financial Harm**

144.    As discussed repeatedly above, the Merger Consideration received by Oclaro shareholders represented just a fraction of the true value of their shares. However, the Proxy misled shareholders regarding the true value of their shares, thereby causing shareholders to approve the unfair Merger. Since the Merger could not have occurred without the approval of Oclaro shareholders, the Proxy was an essential link in the accomplishment of the Merger and the misleading statements were the cause of the Class's (defined below) economic loss.

145.    The causal connection here is straightforward. If Oclaro shareholders had been informed that shares of Oclaro were worth $11-$13 at the time of the Merger and the Board would have been unable to obtain a fairness opinion from Jefferies, then Oclaro shareholders would not have voted to approve the Merger purporting to offer them $9.99 per share.[36] Accordingly, Oclaro shareholders are entitled to damages in the amount of the difference between the price received in the Merger and the fair value of their shares as calculated in accordance with recognized methods of valuation.

146.    Numerous sources indicate that the fair value of Oclaro stock was around $11 per share, far in excess of the Merger Consideration.

147.    First, Plaintiff's financial expert, using recognized methods of valuation, calculated the fair value of Oclaro's shares at the time of the record date of the Merger to be $10.96. This calculation was the result of numerous analyses, detailed research of Oclaro's business, and

---

[36]   At the consummation of the Merger on December 10, 2018, Oclaro shareholders only received $8.36 for each share of Oclaro they owned.

exhaustive review of Oclaro's financial projections and business records obtained during the ongoing discovery process.

148.    Second, in December 2017, Jefferies provided an $11 per share valuation for Oclaro in a potential deal with Inphi.

149.    Third, BCG (Oclaro's undisclosed financial expert) informed the Board on January 24, 2018, that if they were to sell Oclaro—which BCG did not recommend as the best option for the Company—then fair value of Oclaro would be $10-13 per share, or a median of $11.50.

150.    Fourth, a week before the Merger Agreement was finalized, David Trainer[37] published an article performing his own in-depth valuation analyses of Oclaro, including a discounted cash flow analysis. Using a neutral scenario and accounting for the downturn in 2018, Mr. Trainer also calculated the present fair value of Oclaro at $11 per share.

151.    In sum, the Merger, which could not have been accomplished without the materially false and misleading Proxy, caused Oclaro shareholders to forfeit their shares at a substantial discount to their fair value. Accordingly, Plaintiff, on behalf of the Class, seeks to hold Defendants accountable for the financial loss and damages they suffered, which were caused by Defendants' violations of the Exchange Act and breaches of fiduciary duty.

## CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of Oclaro who were harmed by Defendants' actions as alleged herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

153.    This action is properly maintainable as a class action because:

(a)    the Class is so numerous that joinder of all members is impracticable.  As of May 15, 2018, the record date for the Merger, there were 170,656,367 shares

---

[37] Mr. Trainer is an experienced and well-respected corporate finance expert and the founder and CEO of an investment research firm New Constructs. He specializes in reversing accounting distortions on the underlying economics of business performance and stock valuation. He was a member of Financial Accounting Standards Board's Investor Advisory Committee from 2013-2017 and is the author of *Modern Tools for Valuation* (Wiley Finance 2010).

of Oclaro common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Oclaro will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i.      whether Defendants misrepresented material information in the Proxy in violation of the Exchange Act;

      ii.     whether the Individual Defendants violated Section 20(a) of the Exchange Act;

     iii.    whether the Officer Defendants breached their fiduciary duties in connection with the Merger; and

     iv.    whether Plaintiff and other members of the Class suffered damages as a result of Defendants' unlawful conduct.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

154.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

155.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

156.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

157.   Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting Oclaro shareholders' support for the Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which misrepresented and omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially false, misleading, and incomplete because such sections provided a false, misleading, and incomplete valuation picture of Oclaro.  The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

158.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Oclaro, were aware of the Oclaro valuation information but failed to ensure such information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and Rule 14a-9.  The Individual Defendants knew that the Proxy was materially false, misleading,

and incomplete in regard to the above-referenced material information.  The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that Jefferies reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Jefferies as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the true facts concerning the process involved in selling Oclaro and Oclaro's true value, which was far greater than the Merger Consideration the Company's former shareholders received.

159.    The Individual Defendants knew that the material information identified above had been misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be materially false, misleading, and/or incomplete.  Indeed, the Individual Defendants were required to review Jefferies' valuation analyses, question Jefferies as to its derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions.  After reviewing both the underlying materials and the Proxy, the Individual Defendants failed to provide a non-misleading proxy solicitation.

160.    Oclaro is liable for violations of the Exchange Act as the issuing entity of the Proxy and based on the Individual Defendants' violation of the Exchange Act.

161.    Merger Sub is also liable for the Individual Defendants' and Oclaro's violations of the Exchange Act as Oclaro's successor entity.

162.    Lumentum is also liable for the Individual Defendants' and Oclaro's violations of the Exchange Act as the successor owner of Merger Sub.

163.    The above-referenced information that was mispresented and omitted in the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially false, misleading, and incomplete.

164.    As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete Proxy that Defendants used to obtain shareholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.  By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

165.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

166.    The Individual Defendants acted as controlling persons of Oclaro within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Oclaro, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

167.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous

SECOND AMENDED CLASS ACTION COMPLAINT
UNREDACTED VERSION

recommendation of each of the members of the Board to approve the Merger. They were thus directly involved in preparing this document.

169. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in (i) negotiating, reviewing, and/or approving the Merger; and (ii) preparing, reviewing, and/or approving the Fairness Opinion Projections. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

170. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

171. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## **COUNT III**

### **(Against the Officer Defendants for Breach of Fiduciary Duties)**

172. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

173. Defendants Dougherty, Mangan, and LeMaitre (the Officer Defendants) violated the fiduciary duties of care, good faith, loyalty, disclosure, and value maximization they owed to the public shareholders of Oclaro.

174. By the acts, transactions, and courses of conduct alleged herein, the Officer Defendants facilitated the sale of Oclaro at a price they knew was far below fair value in order to advance their own personal interests.

175. As alleged herein, the Officer Defendants engaged in a process to sell Oclaro that undervalued the Company and vested them with benefits that were not shared equally by Oclaro's public shareholders. The Officer Defendants altered the financial information and valuation of Oclaro and withheld material information from the Board and shareholders. By orchestrating the sales process and advocating for the Merger at the low value point for Oclaro, the Officer Defendants caused shareholders to give up their Oclaro stock at a price that did not adequately reflect the Company's true value.

176. The Officer Defendants then misled Oclaro's shareholders regarding Oclaro's fair value in an effort to ensure the Merger was approved and thereby benefit themselves. The Officer Defendants also failed to provide Oclaro's public shareholders with all material information necessary to decide whether to vote their shares in connection with the Merger.

177. As a result of the actions of the Officer Defendants, Plaintiff and the Class have suffered damages in that they did not receive the highest available value for their equity interest in Oclaro, and they also suffered the injury of an uninformed shareholder vote. Plaintiff therefore seeks damages on behalf of himself and the Class, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C. Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D. Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E. Granting such other and further relief as this Court may deem just and proper.

1

## <u>JURY DEMAND</u>

2

Plaintiff demands a trial by jury on all issues so triable.

3

4
DATED: September 17, 2021                    Respectfully submitted,

5
**OF COUNSEL**                               */s/ David E. Bower*
                                             David E. Bower
6
**MONTEVERDE & ASSOCIATES PC**
7
Juan E. Monteverde                          David E. Bower SBN 119546
Miles D. Schreiner                          **MONTEVERDE & ASSOCIATES PC**
8
John W. Baylet                              600 Corporate Pointe, Suite 1170
The Empire State Building                   Culver City, CA 90230
9
350 Fifth Avenue, Suite 4405                Tel: (310) 446-6652
New York, NY 10118                          Fax: (212) 202-7880
10
Tel: (212) 971-1341                         Email:  dbower@monteverdelaw.com
Fax: (212) 202-7880
11
Email: jmonteverde@monteverdelaw.com
          mschreiner@monteverdelaw.com       *Counsel for Lead Plaintiff and*
12
        jbaylet@monteverdelaw.com            *Lead Counsel for the Putative Class*
13

14
*Counsel for Lead Plaintiff and*
*Lead Counsel for the Putative Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54